**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BERNADETTE ROLEN, Administratrix | ) | CASE NO. 1:12 CV 01914 |
| For the Estate of Daniel Ficker, *et al.* | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANT MATTHEW CRASKA'S** |
| CITY OF CLEVELAND, *et al.* | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| Defendants. | ) | |

Now comes Matthew Craska who moves for summary judgment under Rule 56 of

the Federal Rules of Civil Procedure.  There are no issues of material fact on which a

finder of fact could find for Plaintiffs Bernadette Rolen ("Plaintiff") on her claims as

Administratrix of the Estate of Daniel Ficker, and Tiffany Urbach for the alleged of

violations of Ficker's constitutional rights or the alleged state law violations, and Craska

is entitled to qualified immunity from Plaintiffs'claims.  The grounds for this Motion for

Summary Judgment are more fully set forth in the attached Memorandum in Support.

> Respectfully submitted,
> **BARBARA A. LANGHENRY (0038838)**
> Director of Law
>
> s/ John P. Bacevice Jr.
> **JOHN P. BACEVICE JR. (0087306)**
> Assistant Director of Law
> **THOMAS J. KAISER (0014339)**
> Chief Trial Counsel
> Department of Law, Cleveland City Hall
> 601 Lakeside Avenue, Room 106
> Cleveland, Ohio 44114-1077
> Telephone No.:  (216) 664-2800
> Facsimile No.:   (216) 664-2663
> jbacevice@city.cleveland.oh.us
> tkaiser@city.cleveland.oh.us
> *Counsel for Defendant Matthew Craska*

i

## TABLE OF CONTENTS

**Page**

MEMORANDUM IN SUPPORT3

I.      STATEMENT OF THE CASE ............................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 2

III.    STANDARD OF REVIEW ............................................................................... 9

IV.     LAW AND ARGUMENT ................................................................................. 9

    A.  Officer Craska was justified in his intial investigatory detention of Ficker.... 12

    B.  Officer Craska was justified in his attempt to arrest Ficker ........................... 14

    C.  Ficker's extreme violence justified Officer Craska's use of force ................. 16

    D.  Craska is entitled to statutory immunity on all state law claims ................... 18

V.      CONCLUSION ................................................................................................ 18

COMPLIANCE WITH PAGE LIMITATIONS ............................................................. 20

CERTIFICATE OF SERVICE ....................................................................................... 21

## **TABLE OF AUTHORITIES**

*Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921m 32 L.Ed.2d 612 (1972).....................12

*Anderson v. Liberty Lobby,* 477 U.S. 242 (1986) ............................................................10

*Bennett v. City of Eastpointe,* 410 F.3d. 810 (6th Cir. 2005) ............................................12

*Burchett v. Kiefer,* 310 F.3d 937, 941 (6th Cir. 2002) ..................................................9, 17

*Celotex Corp. v. Catret,* 477 U.S. 317, 327 (1986)...........................................................9

*Ciminillo v. Streicher,* 434 F.3d 461 (6th Cir. 2006) ......................................................16

*Columbus v. Fraley,* 41 Ohio St. 173 (1975).............................................................15, 16

*Dickerson v. McClellan,* 101 F.3d 1151 (6th Cir. 1996)..................................................11

*Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 357 ............................11

*Fox v. DiSoto,* 489 F.3d 227 (6th Cir. 2007) ............................................................10, 12

*Graham v. Connor,* 490 U.S. 386 (1989) ........................................................................16

*Hoover v. Garfield Heights Municipal Court, et al.,* 802 F.2d 168 (6th Cir. 1986)..........14

*Hopson v. Daimler Chrysler Corp.,* 306 F.3d 427, 432 (6th Cir. 2002) ............................9

*Knowles v. Iowa,* 525 U.S. 113 S.Ct. 484, 142 L.Ed.2d 492 (1998)...............................12

*Livermore v. Lubelan,* 476 F.3d 397 (6th Cir. 2007) ......................................................11

*Miller v. State (Alaska 1969), 462 P.2d 421*...................................................................16

*Mitchell v. Forsyth,* 472 U.S. 511 (1985).......................................................................10

*Pearson v. Callahan,* 555 U.S. 223 (2009).....................................................................10

*Reese v. Anderson,* 926 F.2d 494 (6th Cir. 1991) ...........................................................17

*Saucier v. Katz,* 533 U.S. 194 (2001).............................................................................10

*State v. Koonce (1965), 89 N.J.Super. 169, 214 A.2d 428) ...........................................15

*State v. Pembaur,* 9 Ohio St.3d 136 (1984).....................................................................15

*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889...............................................12

*United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) ...............14

*Untalan v. City of Lorain, et al.,* 430 F.3d 312 (6th Cir. 2005)........................................17

**Federal Statutes and Regulations**

42 U.S.C. § 1983 ...............................................................................................................1

Fed. R. Civ. P. 56(e)..........................................................................................................9

**Ohio Statutes and Regulations**

O.R.C. § 2744 .............................................................................................................11, 18

O.R.C. § 2744.03(A)(6)...................................................................................................11

<u>MEMORANDUM IN SUPPORT</u>

I.     **STATEMENT OF THE CASE**

The matter before this Court arises out of a tragic incident.  It is a matter in which the Decedent continually escalated violence against a uniformed police officer which left the Officer with no option other than to fire a round at the Decedent.  The single round ended the Decedent's life, leading to this lawsuit.  However, as this Defendant will show, it was ultimately the actions of the Decedent that led to his death and thus, summary judgment should be entered in favor of Defendant Patrol Officer Matthew Craska.

Plaintiffs bring the following causes of action against Defendant Craska:

- Excessive force in violation of the Fourth and Fourteenth Amendment under color of law in violation of 42 U.S.C. Section 1983

- Willful, wanton, and reckless conduct under Ohio law

- State law assault and battery

- State law false arrest

- Infliction of emotional distress by Tiffany Urbach

- Wrongful death

- Survivorship action

Plaintiffs cannot sustain any claims beyond summary judgment.  Craska's initial detention of Ficker was as a matter of law a reasonably brief detention for officer safety.  Craska's attempt to arrest Ficker was after Ficker had committed a crime, against Craska no less, in Craska's presence.  Craska's use of force was at all times objectively reasonable given Ficker's vicious attacks on Craska.  The final three claims are derivative of the first four and, because none of the first four claims can proceed beyond summary judgment, Craska is also entitled to summary judgment on the three latter claims.

1

## II.    STATEMENT OF FACTS

On July 3, 2011 Matthew Craska was working an overnight shift in the Second District on Cleveland¢s near West Side. His shift started in the early evening of July 3rd and was scheduled to go into the early morning hours of July 4th.[1]  Craska¢s went home for his lunch break around 10:00 PM.[2]  Craska¢s home was in the Second District.[3]

Craska received an urgent voicemail from Patrol Officer David Mindek asking Craska if he was working and for Craska to call Mindek back.[4]  Craska called Mindek back at approximately 11:00 PM[5] and Mindek informed him there had been a party at his house and Mindek¢s wife discovered some property missing after the guests had left.[6] The crime scene – Mindek¢s house on Mayview Avenue in Cleveland – was also in the Second District, where Craska was assigned and working.[7]

When Craska arrived at the house on Mayview he called in his location to dispatch and asked for a number to use for his official report.[8]  Kim Mindek came out to the sidewalk to meet Craska in his zone car while he was radioing in to dispatch.[9]  Kim Mindek informed Craska that there had been a party and the guests were instructed that the upstairs was off limits.  Kim also informed Craska that her cousin¢s öon again/off again piece of shit pillhead boyfriendö (Daniel Ficker) was seen coming from upstairs, where the property was discovered.  He was confronted and acted in a nervous manner,

---

[1] Defendant¢s A Deposition of Matthew Craska at 47:11-23.
[2] Defendant¢s A at 49:16-23.
[3] Defendant¢s A at 49:5-12.
[4] Defendant¢s A at 50:13 – 51:6; Defendant¢s B Deposition of David Mindek at 31:4-14.
[5] Defendant¢s A at 59:3-8
[6] Defendant¢s A at 59:3-8.
[7] Defendant¢s A at 52:24 – 53:3.
[8] Defendant¢s A at 54:1-5 and 91:17-22.
[9] Defendant¢s A at 61:14-18.

2

fidgeting in his pockets in such a way, according to Kim Mindek, that looked as if he were trying to hide something.  He could not provide an excuse for why he was upstairs. He left with Kim Mindek's cousin shortly thereafter.[10]

David Mindek arrived home after Craska's arrival.[11]  Mindek informed Craska that the cousin's boyfriend had a prior weapons conviction.[12] Due to a miscommunication, Craska was informed that the cousin's name was Daniel Vicker[13], and asked dispatch to run the name Daniel Vicker which yielded no results.[14]  Craska asked the Mindeks to inventory the missing property amount in order to determine a dollar amount to assess the level of crime Craska was dealing with.[15]  Craska quickly determined the information from the Mindeks constituted the report of a felony crime.[16]

Craska believed from the totality of the information given, that it was credible to believe a crime may have been committed and that the cousin's boyfriend may have had something to do with it.[17]  Craska also believed it was only fair to get a statement from the cousin and the cousin's boyfriend to allow both to tell their sides of the story.[18] Craska asked Mindek to accompany him for multiple reasons.  First, Mindek is a Cleveland Police Officer and thus could provide Craska with back up.  Second, Mindek had met the cousin's boyfriend before and could identify him.  Third, Mindek could

---

[10] Defendant's A at 62:15 – 64:8.
[11] Defendant's A at 70:3-6; Defendant's B at 37:13-15.
[12] Defendant's A at 69:23 – 70:2.
[13] The correct name is "Daniel Ficker" but Officer Craska did not learn that until after the incident.
[14] Defendant's A at 69:18-22 and 71:25 – 72:9; Defendant's B at 39:9-20.
[15] Defendant's A at 71:25 – 72:9.
[16] Defendant's A at 237:17-22 and 238:1-4.
[17] Defendant's A at 78:8:16.
[18] Id.  See also Defendant's A at 79:2-9 and 94:11 – 95:2.

identify the missing items if found.[19]  Although Craska did not anticipate there would be any problems with interviewing either the cousin or the cousin's boyfriend,[20] Craska thought with Mindek being a familiar face to the cousin the familiarity could defuse a potential confrontation and would be a little better for the cousin and the boyfriend.[21] The cousin lived in Parma, Ohio.  Craska informed dispatch of his intention to leave Cleveland for Parma and received permission to proceed to Parma, Ohio.[22]

Craska and Mindek arrived on scene and knocked on the front and side doors of the house to no avail.[23]  At that point, Tiffany Urbach and Daniel Ficker returned home pulling into the driveway.[24]  Urbach was driving and Ficker was the passenger.[25]  Craska approached the passenger side while Mindek approached the driver side.[26]  Urbach got out of the car and approached David Mindek.[27]  Craska reasonably relied on the information relayed to him by Mindek; specifically that Ficker has a history with both weapon and drug offenses as well as stealing from the family.[28]  Craska noticed Ficker was highly intoxicated.[29]  Craska, knowing what Mindek told him about Ficker's criminal history, wanted to pat Ficker down for officer safety.[30]

---

[19] Defendant's A at 80:10 – 81:15; Defendant's B at 39:9-20.
[20] Defendant's A at 84:4-8.
[21] Defendant's A at 98:24 – 99:9.
[22] Defendant's A at 85:3-9; 87:5-16; 90:13-20; 91:10-13.Defendant's C Deposition of Randolph Daley at 14:8-11 and 19:6 – 20:7.
[23] Defendant's A at 104:8-17.
[24] Defendant's A at 104:8-17.
[25] Defendant's D Deposition of Tiffany Urbach at 54:5-11.
[26] Defendant's D at 58:18-21.
[27] Defendant's B at 55:10-16; Defendant's D at 64:8-18.
[28] Defendant's A at 97:18-24.
[29] Defendant's A at 102:6-8; Defendant's E Cuyahoga County Toxicology Laboratory Report of Daniel Ficker; Exhibit F Parma Subpoena and Metro General Hospital response to Subpoena to Produce Blood/Alcohol Records of Daniel Ficker.
[30] Defendant's A at 101:22 – 102:1; 108:19-25; and 119:5-17.

While Craska approached Ficker, Mindek approached Tiffany Urbach .[31] After Mindek explained to Urbach why the two officers were there, Urbach angrily shouted permission to search both the car and the house for any stolen property.[32] Craska heard Urbach consent to a search, and wanted to safely search the car and the home for the missing property, the underlying focus of the Second District criminal complaint by the Mindeks.[33] However, Craska did not believe he could safely search the premises with an intoxicated, and now belligerent, Ficker – a person Craska reasonably believed to have a felonious past including a weapons charge and thus could be potentially dangerous, due to the information relayed by Mindek – unless Ficker were briefly detained for officer safety.[34] Ficker would not go to Craska's zone car voluntarily, but also did not yet begin to actively resist, so Craska walked Ficker to his zone car to pat Ficker down.[35] Craska clearly stated to Ficker he was not under arrest.[36] Craska patted Ficker down and found a knife and tossed it away for safety purposes.[37] Craska then instructed Ficker to have a seat in the back of the zone car again telling Ficker he was not under arrest.[38]

When Craska instructed Ficker into the back seat of the zone car, Ficker – who had already been screaming and shouting and generally uncooperative[39] while visibly intoxicated – told Craska, "No, fuck you," and braced himself against the roof and door

---

[31] Defendant's B at 57:16 – 58:4.
[32] Defendant's B at 58:25 – 59:7; Defendant's D at 72:12-15.
[33] Defendant's A at 102:13 – 103:2; 105:11-20; 108:19-25; 121:16-22; 124:10-11; and 125:7-15.
[34] Defendant's A at 101:22 – 103:2; 105:11-20; 108:19-25; 119:5-17; 121:16-22; and 125:7-18.
[35] Defendant's A at 116:1-11 and 118:1-5; Defendant's B at 58:10-19.
[36] Defendant's A at 119:5-17; 121:11-15; and 125:1-3.
[37] Defendant's A at 121:24-25 and 124:5-23.
[38] Defendant's A at 121:23 – 122:6; 124:24 – 125:3; and 130:18-23.
[39] Defendant's B at 60:3-13 and 116:3-13.

5

of the car to not allow Craska to seat him in the back seat.[40] Craska tried to lean into Ficker with his hip and nudge Ficker into the back of the zone car, but Ficker's non-compliance continued.[41] Ficker then turned from non-compliant to violent.

Ficker spun off of the zone car and struck Craska with a right elbow to the breast bone.[42] After Ficker assaulted Craska, Craska defended himself by hitting Ficker in the nose and taking him to the ground in an arm bar.[43] Craska then informed Ficker he was under arrest for assault on a police officer.[44] Craska ordered Ficker to put his hands on his head.[45] Ficker did not comply but instead tried to use his free hand and his knees to push himself up and get away from Craska.[46] Craska was able to knock his hands and knees away for about a minute, until Ficker was able to get his hand and knees under him and get up and get away from Craska.[47] Ficker threw a couple of punches at Craska while Craska was trying to stand up.[48] Ficker backed up and got into a fighting stance. Craska pulled out his taser. Ficker said to Craska, "C'mon, let's go." Craska warned Ficker to get on the ground or he would be tased. Ficker said, "No, fuck you. Let's go. I'm going to get some work in and it's going to be on you." Craska said, "Dan, you're going to get tased. Get on the ground." Ficker replied, "Nope, fuck you. Let's go."[49]

---

[40] Defendant's A at 122:2-6; 130:18-24; and 138:24-25; Defendant's B at 60:23 – 61:6; 61:11-17; and 65:4-8.
[41] Defendant's A at 139:2-4.
[42] Defendant's A at 139:5-8; Defendant's B at 67:15-18.
[43] Defendant's A at 140:11-22 and 142:11-18.
[44] Defendant's A at 143:1-6; Defendant's B at 77:1-16.
[45] Defendant's A at 143:19-21.
[46] Defendant's A at 143:21-23.
[47] Defendant's A at 143:23 – 144:5.
[48] Defendant's A at 145:11-17.
[49] Defendant's A at 149:21 – 150:18; Defendant's B at 69:16-21 and 73:16-24.

Craska deployed his taser.  Ficker staggered back as if the taser had an effect, but then Ficker caught his balance and stood up.  Ficker looked down and said, "What the fuck is this?"  Ficker pulled the taser prong out of his chest and threw it to the ground.[50]  The taser had no effect.  Craska threw the taser toward the next yard so the weapon could not be used against him.[51]  Ficker then moved toward the front yard, and then laterally back toward the sidewalk.  Craska again informed Ficker he is under arrest and he needs to get on the ground.  Ficker again told Craska, "Nope, fuck you.  Let's go."  Ficker and Craska then tangled up and went to the ground and Ficker continued fighting as Craska continued to try to effectuate an arrest.[52]

Craska and Ficker were now wrestling and punching each other.  Mindek managed to apply Craska's handcuffs to one of Ficker's wrists.[53]  Ficker then headbutted Craska to the front of Craska's head.  Craska went for his radio microphone to call for help.  Ficker grabbed the microphone from Craska and pulled it in an apparent attempt to rip the microphone off of Craska.  After that failed, Ficker began whipping Craska with his own microphone.[54]  Ficker's violent attacks on Craska then escalated to attempts on Craska's life.

While wrestling on the ground, Ficker headbutted Craska multiple times, catching Craska above his eye.[55]  During the fight, Craska's glasses were knocked off.[56]  Craska

---

[50] Defendant's A at 154:2-11; Defendant's B at 70:1-10 and 73:16-24.
[51] Defendant's A at 157:6-10.
[52] Defendant's A at 155:9-18; 159:3-19; 160:16-21; and 163:12-22.
[53] Defendant's B at 80:22 – 81:8.
[54] Defendant's A at 163:12 – 165:24; Defendant's B at 78:2-8 and 83:22 – 84:19.
[55] Defendant's A at 166:13 – 168:24; Defendant's B 76:2-10 and 83:22 – 84:19.
[56] Defendant's A at 173:24 – 174:1.

has very poor vision without his glasses on.[57]  Also, in actions one could only reasonably

interpret as attempts on Craska's life, Ficker twice attempted to choke Craska out with

his legs – getting one leg over Craska's head and another leg underneath Craska's chin in

a potentially deadly chokehold.[58]  While choking Craska for a second time, Ficker

attempted to go for Craska's gun.[59]  Mindek shouted to Craska that Ficker was going for

his gun.[60]  Craska felt the flap on his holster had been opened and both he and Mindek

put their hands on top of Craska's weapon in order to prevent Daniel Ficker from gaining

control of the gun.[61]  Ficker's actions can only be reasonably interpreted as attempts to

kill Craska.

Finally, Craska drew his service weapon with his right hand and put it behind his

back.  He continued to fight Ficker with his left hand until he was able to shove Ficker

off and Ficker briefly back away a short distance from Craska.  Craska was beginning to

lose consciousness from the physical exertion.  Craska brought his weapon up and

pointed it at Ficker, warning Ficker to stop resisting, warning him to stop going for his

gun, telling him he is under arrest, and telling him if he does not stop he is going to die.

Craska could barely hold his arms up.  Craska believed, based on Ficker's actions, Ficker

intended to kill him.[62]

---

[57] Defendant's A at 173:24 – 174:1.
[58] Defendant's A at 171:10 – 174:22; Defendant's B at 84:24 – 85:6.
[59] Defendant's A at 169:15-20, 170:15-24, 173:16-19; Defendant's G Cuyahoga County DNA Laboratory Examination Report.
[60] Defendant's A at 169: 15-20 and 170:15-24; Defendant's B at 82:5 – 83:9.
[61] Defendant's B at 82:5 – 83:9 and 93:2-4.
[62] Defendant's A at 178:6 – 180:3.

Despite Craska's commands, Ficker got into a fighting stance.[63]  He came at

Craska again an attempted to give Craska another blow.[64]  Craska, in self-defense, fired a

single round at Ficker.[65]  The autopsy proves the muzzle of the weapon was six-to-nine

inches from Ficker when the weapon was fired.[66]  The single shot fired in self-defense

caused Daniel Ficker's death.

## III.    STANDARD OF REVIEW

A court must grant summary judgment where there remain no genuine issues as to

any material fact, the moving party is entitled to judgment as a matter of law, and it

appears from the evidence that reasonable minds can come to but one conclusion and,

viewing the evidence most strongly in favor of the party opposing the motion, that

conclusion is adverse to that party.  *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002);

*Hopson v. Daimler Chrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).  Summary

judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an

integral part of the Federal Rules as a whole."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

327 (1986).  "When a motion for summary judgment is made and supported as provided

in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the

adverse party's pleading, but … must set forth specific facts showing that there is a

genuine issue for trial."  Fed. R. Civ. P. 56(e).  The materiality of a fact is determined by

reference to substantive law.  Only disputes over facts that might affect the outcome of

the suit under the governing law will properly preclude the entry of summary judgment.

---

[63] Defendant's A at 179:5-21 and 189:25 – 191:2.
[64] Defendant's A at 179:5-21; 188:8-20; and 189:25 – 191:2.
[65] Defendant's A at 188:8-20; Defendant's B at 86:9-12
[66] Defendant's H Cuyahoga County Test Fire Resuts; Defendant's I Scene Recreation DVD.

9

Factual disputes that are irrelevant or unnecessary will not be counted.  *Anderson v. Liberty Lobby*, 477 U.S 242, 248 (1986).

## IV.    LAW AND ARGUMENT

Defendant Craska, under the undisputed facts of this case, cannot be held liable as a matter of law.  The undisputed facts of the case do not provide a basis to maintain a single alleged violation of federal or state law by Craska.  Additionally, Craska is entitled to qualified immunity as to Plaintiff's federal claims and statutory immunity under the Ohio Revised Code as to all state claims.

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511 at 526 (1985).  "The protection of qualified immunity applies regardless of whether the government official's error is ¬a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223 at 231 (2009) (internal citations omitted).

In determining whether qualified immunity applies, a two part test is applied.  The steps are not required to be taken in order.  *Id.*  First, a court must determine whether the acts violated a constitutional right.  Second, the court must determine if at the time of the actions, the constitutional right was "clearly established." *Saucier v. Katz*, 533 U.S. 194 (2001).  It is important to note at the outset that the ultimate determination of Craska's entitlement to immunity in this matter is evaluated based on what a reasonable officer would believe or understand at the time of the event given the facts known to that officer, not a review of the situation in 20/20 hindsight. *Fox v. DiSoto*, 489 F.3d 227 at 236 (6th Cir. 2007).

When analyzing an excessive force claim, the court must view each allegation individually focusing on the "split second judgments" made immediately before the officer used allegedly excessive force." *Livermore v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) citing *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996).

Craska is also immune from all state law claims under Ohio Revised Code Chapter 2744.  Ohio Revised Code Chapter 2744 specifically grants immunity to employees of political subdivisions for negligence claims arising out of the course and scope of the person's employment with the political subdivision. *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 357.  Specifically, R.C. § 2744.03(A)(6) provides that an employee of a political subdivision is immune from liability unless one of the following exceptions applies:

    i.      The employee's acts or omissions were manifestly outside the scope of his employment;

    ii.     The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or

    iii.    Civil liability is expressly imposed by a section of the Revised Code.

Ohio Rev. Code § 2744.03(A)(6)(a)-(c).

At all times Craska was acting within the scope of his employment and none of his actions or omissions "were with malicious purpose, in bad faith, or in a wanton or reckless manner."

In reviewing each individual claim as they relate to Defendant Craska, as a matter of law Plaintiff cannot advance beyond the summary judgment stage and the Court should rule for Craska on all counts.

### A.  Craska was justified in his initial investigatory detention of Ficker.

Plaintiff claims Craska falsely arrested Ficker in violation of his Fourth and Fourteenth Amendment rights.  Initially, we must recognize the two separate and distinct seizures of the Decedent.  When Craska initially approached Ficker, he (correctly) believed he was approaching a person with a felony record.  He also immediately appreciated Ficker's severe level of intoxication.  Due to these two factors, Craska reasonably determined he should make a brief investigatory detention to pat Ficker down for officer safety purposes.

"A concern for officer safety permits a variety of police responses in differing circumstances … [including] conducting pat-down searches –upon reasonable suspicion that they may be armed and dangerous."*Knowles v. Iowa*, 525 U.S. 113, 118, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (emphasis added) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889)." *Bennett v. City of Eastpointe*, 410 F.3d. 810, 822 (6th Cir. 2005).  Again, Craska's decision to pat down Ficker for officer safety must be analyzed based on what a reasonable officer would believe or understand at the time.  *Fox v. DiSoto* at 236.  "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (internal citations omitted).

Craska believed he was approaching a person with a previous felony weapons conviction.  Craska noted the person was severely intoxicated.  Craska recognized approaching a person with questions about a theft could create a volatile situation.  Based on the totality of articulable circumstances, Craska was justified in a brief detention to pat down Ficker for officer safety purposes.

Craska walked Ficker to his zone car to pat him down, but before commencing the pat down heard Tiffany Urbach give consent to search both the house and the car for the missing property.  Craska intended to commence the lawful and permitted search, but did not believe he could safely do so if Ficker were not briefly detained.  Again, the issue was safety.  In his intoxicated state, Ficker was shouting and continued being generally uncooperative.  Craska, during his pat down, found a knife on Ficker which he tossed aside.  Craska's believed Ficker was a safety risk and thus wanted him secured in the back seat of the zone car prior to Craska commencing his search for the missing property.  Craska was justified in his attempt at this brief detention to maintain the status quo while obtaining more information by lawfully searching the car and house.

Sadly, Ficker's own actions illustrate why Craska's pat down for officer safety purposes was objectively reasonable and lawful.  A police officer approaching anyone unknown about a possible crime inherently carries some level of risk.  Add in information that the person has a previous weapons violation and the compounding factor of heavy intoxication, and Craska made a judgment call that for safety purposes he needed to do a pat down and later a brief detention in order to search the car and home with Urbach's permission.  Craska did find a knife on Ficker and discarded it.  Ficker turned out to be exactly the type of person law officer's fear when they are concerned

13

enough about officer safety to perform a pat down.  Ficker started as aggressively uncooperative, and then progressed to violent and finally deadly.

Because of the very real safety concerns illustrated by Ficker's own subsequent actions, and under well-established law, Craska's brief detention of Daniel Ficker, first for a pat down and then in furtherance of his effort to search for the missing property, was a lawful detention for officer safety purposes and did not violate Daniel Ficker's rights.  Thus, regarding the initial and brief non-arrest detentions, the claims of violating the Fourth and Fourteenth Amendment as well as state law false arrest are not supported by the facts regarding the initial non-arrest detentions.

**B.  Craska was justified in his attempt to arrest Ficker.**

Upon escorting Ficker to the back seat of his zone car and instructing him to sit down, again reminding him he was not under arrest, Ficker decided to assault by elbowing Craska in the chest.  The Sixth Circuit has established an officer's right to lawfully arrest a person who assaults the officer.  "The Supreme Court has approved and applied  the ancient common-law rule that a peace officer [is] permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there [is] reasonable ground for making the arrest."  *Hoover v. Garfield Heights Municipal Court, et al.*, 802 F.2d 168, 171 (6th Cir. 1986) quoting *United States v. Watson*, 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976).

Even assuming *arguendo* Ficker's elbow was in response to Craska unlawfully restraining his liberty, it would not excuse his elbow strike to Craska.  "[I]n the absence of excessive or unnecessary force by an arresting officer, a private citizen may not use force

14

to resist arrest by one he knows, or has good reason to believe, is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances." *Columbus v. Fraley*, 41 Ohio St. 173, 180 (1975).  See also *State v. Pembaur*, 9 Ohio St.3d 136, 139 (1984) "[T]he legality of the police action, absent excessive force, is not a factor to consider when determining whether a privilege to resist exists."

The Ohio Supreme Court, in *Fraley*, quoted the Appellate Division of the New Jersey Superior Court, illustrating with almost a prescient sense of the exact scenario that unfolded before Craska, why the law does not permit resistance to an arrest – regardless of legality – absent excessive force:

> "[A]n appropriate accommodation of society's interests in securing the right of individual liberty, maintenance of law enforcement, and prevention of death or serious injury not only of the participants in an arrest fracas but of innocent third persons, precludes tolerance of any formulation which validates an arrestee's resistance of a police officer with force merely because the arrest is ultimately adjudged to have been illegal. Force begets force, and escalation into bloodshed is a frequent probability. The right or wrong of an arrest is often a matter of close debate as to which even lawyers and judges may differ. In this era of constantly expanding legal protections of the rights of the accused in criminal proceedings, one deeming himself illegally arrested can reasonably be asked to submit peaceably to arrest by a police officer, and to take recourse in his legal remedies for regaining his liberty and defending the ensuing prosecution against him. At the same time, police officers attempting in good faith, although mistakenly, to perform their duties in effecting an arrest should be relieved of the threat of physical harm at the hands of the arrestee." *Fraley* at 179-180 quoting *State v. Koonce* (1965), 89 N.J.Super. 169, 183, 214 A.2d 428, 435.

*Fraley* also quoted the Supreme Court of Alaska in supporting its holding that absent excessive force a private citizen may not resist arrest by an officer, stating:

15

"The control of man's destructive and aggressive impulses is one of the great unsolved problems of our society. Our rules of law should discourage the un-necessary use of physical force between man and man. Any rule which promotes rather than inhibits violence should be re-examined. Along with increased sensitivity to the rights of the criminally accused there should be a corresponding awareness of our need to develop rules which facilitate decent and peaceful behavior by all." *Fraley* at 180 quoting *Miller v. State* (Alaska 1969), 462 P.2d 421, 426.

Craska was dressed in full uniform and was an on duty sworn police officer. No reasonable person could dispute Craska was "an authorized police officer engaged in the performance of his duties." Prior to Ficker's elbow to Craska, Craska had used bare minimum levels of force, merely guiding Ficker from Ficker's car to Craska's zone car. When Ficker first struck Craska, Craska had not used any excessive force or any force that could be mistake for excessive. Craska had used minimal physical contact. Because Ficker's strike of a uniformed officer was a crime committed in Craska's presence, Craska's attempt to arrest Ficker was lawful and did not violate any of Ficker's rights under either federal or state law.

### C. Ficker's extreme violence justified Craska's use of force.

During the entirety of the physical encounter between Craska and Ficker, Ficker was the aggressor. When assessing an excessive force claim the court must consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). While a number of factors go into the analysis, such as "the severity of the crime at issue [and] whether the suspect poses an immediate threat to the safety of the officer or others," *Id* at 396, "the ultimate question is whether the totality of the circumstances justifies a particular sort of seizure." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006). The standard "contains a built-in measure of

deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

The Sixth Circuit has determined that a police officer's use of deadly force was not excessive and was objectively reasonable and, therefore, not a Fourth Amendment violation if the officer has probable cause to believe that the suspect poses a threat of severe physical harm to the officer or to others. *Untalan v. City of Lorain, et al.*, 430 F.3d 312, 314 (6th Cir. 2005).

In further support of the proposition that a police officer under these circumstances is entitled to qualified immunity, the Sixth Circuit observed, "[a]lso irrelevant is the fact that the decedent was actually unarmed— the sad truth is that [the decedent's] actions alone could cause a reasonable officer to fear imminent and serious physical harm." *Reese v. Anderson*, 926 F.2d 494, 501 (6th Cir. 1991).

Ficker's violent attacks against Craska were life threatening.  Ficker headbutted Craska's head multiple times.  Ficker attempted to choke Craska with a scissor lock around Craska's neck twice.  Ficker used Craska's portable microphone and cord to whip Craska with the microphone.  Ficker tried to get Craska's gun.  We can never know what Ficker's intentions were during his attacks on Craska, but Craska can and did reasonably construe Ficker's actions as attempts on Craska's life.  Any contrary conclusion is objectively unreasonable.  Finally, after all of this, Craska warned Ficker to surrender or "you're going to die."  Craska was physically spent.  His glasses were knocked off and he could barely see.  He was drifting on the edge of consciousness.  Nevertheless, Ficker attacked again.  So Craska fired a single round, striking Ficker from within a foot.

17

Considering Ficker's actions and the situation Craska was in, the use of deadly force was not only a reasonable option, it was Craska's only option.

Every strike and punch by Craska, the use of his taser, and the use of his service weapon were proportional responses to the continuing escalation of violence by Daniel Ficker.  Under well-established law, both federal and state, Craska's used objectively reasonable levels of force given the situation at hand and did not violate any of Daniel Ficker's rights.

**D.  Craska is entitled to statutory immunity on all state law claims.**

As explained above, Ohio Revised Code Chapter 2744 grants immunity to state actors acting within the course and scope of their official capacity unless a specific exception applies.  Craska police actions were within the course and scope of his employment.  There is nothing in the record to suggest malice, bad faith, or wanton or reckless actions.  There is no applicable express liability.  The Court should rule for Craska on all state claims.

**V.    CONCLUSION**

For the above reasons, Matthew Craska is entitled to summary judgment on all claims.

Respectfully submitted,

**BARBARA A. LANGHENRY (0038838)**
Director of Law

s/ John P. Bacevice Jr.
**JOHN P. BACEVICE JR. (0087306)**
Assistant Director of Law
**THOMAS J. KAISER (0014339)**
Chief Trial Counsel
Department of Law, Cleveland City Hall
601 Lakeside Avenue, Room 106
Cleveland, Ohio 44114-1077
Telephone No.:  (216) 664-2800
Facsimile No.:  (216) 664-2663
jbacevice@city.cleveland.oh.us
tkaiser@city.cleveland.oh.us
*Counsel for Defendant Matthew Craska*

19

## <u>COMPLIANCE WITH PAGE LIMITATIONS</u>

The undersigned certifies that the case that the above Memorandum in Support of Defendantøs Motion for Summary Judgment complies with the page limitations set forth by Court Order on May27, 2014.

 s/ John P. Bacevice Jr.

John P. Bacevice Jr. (0087306)

Attorney for Defendant Matthew Craska

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Defendant's Motion for Summary Judgment
and Memorandum in Support was filed electronically on June 2, 2014. Notice of this
filing will be sent to all parties by operation of the Court's electronic filing system.
Parties may access this filing through the Court's system.

s/ John P. Bacevice Jr.