## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| BERNADETTE ROLEN, Etc., et al. | ) | CASE NO.    1:12-CV-1914 |
| | ) | |
| Plaintiffs | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| -vs- | ) | |
| | ) | **PLAINTIFFS' OPPOSITION TO** |
| CITY OF CLEVELAND, et al. | ) | **DEFENDANT CITY OF CLEVELAND'S** |
| | ) | **MOTION FOR SUMMARY** |
| Defendants | ) | **JUDGMENT** |

Plaintiffs, by and through counsel, hereby submit this opposition to Defendant City of Cleveland's Motion for Summary Judgment. For the reasons discussed below, summary judgment is entirely inappropriate in this case, where multiple factual disputes central to the legal issues in this case remain, and Defendant's legal arguments fail. Therefore, Plaintiffs request that the Court deny Defendant City of Cleveland's Motion and permit trial to continue.

Respectfully submitted,

FRIEDMAN & GILBERT

s/ Terry H. Gilbert
TERRY H. GILBERT (0021948)
GORDON S. FRIEDMAN (0021946)
55 Public Square, Suite 1055
Cleveland, OH 44113-1901
Telephone:    (216) 241-1430
Facsimile:    (216) 621-0427
E-Mail:       tgilbert@f-glaw.com
              gorlaw@f-glaw.com

Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

Table of Authorities .................................................................................................. iii

Memorandum in Opposition to Summary Judgment .................................................. 1

I. Statement of the Case ............................................................................................ 1

II. Statement of Facts ............................................................................................... 2

    A.  The City of Cleveland Has No Policy on Division Personnel Leaving the
    City and Conducting Police Matters, thereby Giving Officers Free Reign
    to Do as They Please ............................................................................................ 3

    B.  The City's Training in Lawful Detentions and Arrests Is Inadequate ............... 4

    C.  The City's Training in the Use of Intermediate Force Weapons Is Inadequate ..... 5

    D.  The City Failed to Supervise Craska and Mindek, Pursuant to Violations of
    Its Own Policies on Use of Force Investigations and Internal Affairs-
    Recommended Discipline ...................................................................................... 7

III. Standard of Review ............................................................................................. 8

IV. Applicable Law and Argument ............................................................................. 8

    A.  Daniel Ficker's Constitutional Rights Were Violated by Defendants
    Craska and Mindek ............................................................................................. 8

    B.  The City's Customs, Policies, and Practices Were the Moving Force Behind
    Craska's and Mindek's Violations of Daniel Ficker's Constitutional Rights. ..... 9

        1.  The City's Lack of Policy Training Regarding the Supervision and
        Conduct of Officers Concerning Out-of-Jurisdiction Police Matters
        Was Inadequate and Amounts to Deliberate Indifference. ........................... 9

        2.  The City's Policies on Use-of-Deadly-Force Investigations and
        Internal Affairs Unit Administrative Reviews Cannot Be Used as
        Evidence of Adequate Supervision. .............................................................. 14

        3.  The City's Inadequate Training in Probable Cause Determinations
        Amounts to Deliberate Indifference. ............................................................ 15

i

## TABLE OF CONTENTS
### (Continued)

**Page**

    4.  The City's Inadequate Training in Use of Intermediate Force
Weapons Amounts to Deliberate Indifference............................................................ 16

V. Conclusion .................................................................................................................... 18

Compliance with Page Limitations .................................................................................. 19

Certificate of Service ....................................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242 (1986) ....................................................................8

*Bd. Of County Comm'rs v. Brown*, 520 U.S. 397 (1997) ............................................................10

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006) ...................................................................9

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) ................................................................11

*Connick v. Thompson*, 131 S.Ct. 1350 (2011) ...........................................................................9

*Diaz v. Salazar*, 924 F. Supp. 1088 (D.N.M. 1996) ....................................................................16

*Graham v. Connor*, 490 U.S. 386 (1989) ....................................................................................18

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) .......................................................10

*Miller v. Sanilac Cnty.,* 606 F.3d 240 (6th Cir.2010) ....................................................................8

*Monell v. New York City Dep't of Social Service*, 436 U.S. 658 (1978) .................................8, 16

*Robinson v. Barrow*, 1:11-CV-01609, 2012 WL 864045 (N.D. Ohio Mar. 13, 2012)........ 9-11, 13

*Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1983) .........................................................18

*Siler v. Webber*, 443 F.App'x. 50 (6th Cir. 2011) .........................................................................9


**Federal Statutes**

42 U.S.C. § 1983....................................................................................................................... 8

Fed. R. Civ. P. 56(a) ...................................................................................................................8

US. CONST. amend. IV ..............................................................................................................18

## MEMORANDUM IN OPPOSITION TO SUMMARY JUDGMENT

### I.    STATEMENT OF THE CASE

The matter before this Court arises out of a tragic and outrageous incident. Two Cleveland police officers left their jurisdiction to confront Daniel Ficker and Tiffany Urbach at their home in Parma. They left the City and entered Parma's after receiving cursory permission from a supervisor. They failed to inform the supervisor that one of the officers was off-duty and was also the complainant in the criminal investigation. They also failed to explicitly tell the supervisor that they were pursuing a criminal investigation. The supervisor asked them no questions about why there were going, what they planned to achieve, or how they should conduct themselves in another jurisdiction. The two officers went to Parma in the absence of policies, procedures, training, and supervision regarding how to conduct an out-of-jurisdiction investigation. They went there with carte blanche authority because of this lack of policy, procedure, training, and supervision. The officers also had apparent inadequate or lack of training in specific issues, including, for example, probable cause determination and intermediate force weapon use.

The officers arrived in Parma without supervisory guidance and were ill-equipped to assess the nuances of the out-of-jurisdiction setting. Foreseeably, this lack of policy, supervision, and training combined with inadequate training in other skills, and coalesced into multiple constitutional violations, including unlawful seizure and arrest, excessive force, and unjustifiable deadly force. The Cleveland Division of Police's Internal Affairs Unit found that Craska and Mindek violated multiple policies during this incident and recommended them for discipline. Inexplicably, the City decided to refrain from taking disciplinary measures pending the outcome in this case.

1

Plaintiffs now bring a municipal liability claim against Defendant City of Cleveland. Plaintiffs' claim against the City rests upon disputed material facts, and should be left to a jury to decide. Defendant's Motion for Summary Judgment should be denied.

## II.    STATEMENT OF FACTS

Plaintiffs adopt and incorporate by reference the statements of facts contained in their separate Motions in Opposition to Craska's and Mindek's Motions for Summary Judgment. Plaintiffs additionally adopt and incorporate by reference all of the exhibits cited in those separate Motions in Opposition.

In addition to the facts alleged specifically regarding Defendant Craska's and Defendant Mindek's liability, Plaintiffs offer additional facts surrounding the policies, procedures, training, and supervision which gave rise to Craska's and Mindek's violations.

Craska's and Mindek's unconstitutional acts did not happen in a vacuum. The whole debacle began when Officer Craska and off-duty Officer Mindek left Cleveland, their jurisdiction, for Parma. Craska, who was on-duty, casually informed a supervisor via radio that he was going to Parma, only stating that he was getting further information on a report (without stating that he was investigating a crime). He was given permission by Sgt. Randolph Daley. Daley responded only because the Community Service Unit (CSU) in that District, where Craska was assigned, had no boss on duty that night. ECF 39-1, Craska Dep. at 87:9-88:4; ECF 39-3, Deposition of Randolph Daley at 16:8-12. Thus, supervisory needs for CSU officers were handled during that shift – and presumably regularly during other "split shifts" when it was "the boss's night off" – by supervisors for other units who were not intimately involved with the CSU's personnel or functions. ECF 39-1, Craska Dep. at 87:22-23.

Sgt. Daley granted permission to Craska to go to Parma without asking any questions. He operated on the mere inference that Craska was going to Parma to investigate criminal activity,

and was unaware whether he was going alone or with a passenger, whether the situation would be dangerous, whether he needed backup, and did not ask why he needed to leave the City of Cleveland on a busy night. ECF 39-3, Daley Dep. at 21:21-25:21. Craska confounded the situation when he failed to communicate that an off-duty officer (Mindek) was the complainant in the case, that he was taking the complainant along on his trip to Parma, or that the trip might involve a confrontation, interaction, or interview with a possible suspect. Ex. B, CDP IAU Inv. At 5, 8-9. Of course, Officer Mindek also failed to notify any supervisor, or to call 911 dispatch regarding the theft, and he also failed to inform anyone that he was going to accompany Craska or ride along in a city police vehicle. *Id*. at 33, 35. In fact, Defendant Craska opted to turn down an offer for back-up: Craska told an officer offering to come along that he was not needed, explaining that Craska and Mindek were just going to get a statement. ECF 39-1, Craska Dep. at 87:5-15. Mindek was in the car as "victim" and "back-up." ECF 39-1, Craska Dep. at 81:10-82:21.

### A.  The City of Cleveland Has No Policy on Division Personnel Leaving the City and Conducting Police Matters, thereby Giving Officers Free Reign to Do as They Please.

Former Chief of Police Michael McGrath acknowledged that, at the time Daniel Ficker was killed, the City had <u>no</u> specific policy and procedure in regard to division personnel leaving the city and conducting police matters. Deposition of Chief Michael McGrath [Plaintiffs' Exhibit M] at 39:14-40:1. Former Chief McGrath noted allowing officers to leave the City should be premised on supervisors having adequate information to make a good decision as to whether or not to grant permission to the officer. *Id*. at 40:2-23. In the instant case, Defendants Craska and Mindek failed to provide this information to Sgt. Daley, and Daley neglected to ask for it. He attributed his lack of questions to "handling other assignments on radio, and wasn't really thinking about it. ECF 39-3, Daley Dep. at 26:15-18. Craska asserted that he did not violate any "rule or

3

reg" in not disclosing these pertinent details to Daley when he asked permission to go to Parma. ECF 39-1, Craska Dep. at 233:1-9.

Lieutenant Bruce Cutlip acknowledged this policy and practice failure in the CDP's Internal Affairs Unit Administrative Review (regarding the circumstances surrounding Mindek's and Craska's actions on July 3 and 4, 2011). After reviewing this incident in its entirety, Lt. Cutlip specifically requested that "divisional policies be reviewed and updated in regards to divisional personnel leaving the city and conducting police matters." *See* Ex. A, CDP IAU Administrative Review at 3.

The complete lack of policy and training on how to conduct out-of-jurisdiction police matters led directly to Daley's blanket permission, *sans* supervision, given to Craska and Mindek on their misguided jaunt to Parma. Once Craska and Mindek arrived in Parma, they were ill-equipped to handle the foreseeable heightened tensions associated with operating outside of their jurisdiction. With this blanket permission to do what they pleased without supervision, and in the unfamiliar and more delicate context of out-of-jurisdiction police work, the consequences of Craska's and Mindek's inadequate training in other areas were amplified.

**B. The City's Training in Lawful Detentions and Arrests Is Inadequate.**

The CDP IAU determined that Craska and Mindek operated in contravention of policies and practices in regard to whether they had reasonable suspicion to detain Daniel Ficker and whether it was necessary or prudent to go to Parma to confront Daniel in light of the circumstances. Further, the IAU determined that Defendant Craska's actions "not only led to the subsequent death of Daniel Ficker, but also put [Craska's] and Officer Mindek's lives in jeopardy," and that it "appeared as though [Craska and Mindek] took matters into their own hands." Ex. B, CDP IAU Investigation Report at 25-26. The IAU also determined that Defendant Mindek's actions were

4

"minimal and not in compliance with the Use of Force Continuum," and that he "may have contributed in the death of Daniel Ficker and put Officer Craska's life at risk as well, both of which may have been preventable." *Id*. at 33-34.

In fact, Mindek's and Craska's confusion over what satisfied reasonable suspicion and probable cause was obvious in their depositions. ECF 39-1, Craska Dep. at 103:13-17; ECF 39-2, Mindek Dep. at 113:16-115:13. CPD officers only receive training on probable cause determinations in the academy. The City admits that they receive no additional or refresher training on this issue once they join the force as full-fledged officers. ECF 41-7, Declaration of Brandon Kutz at 6. In cases where officers are on the force for some time, such as Mindek (Cleveland Police Academy in 1997) and Craska (Cleveland Police Academy in 1999), they receive no additional probable cause training after their time at the academy is completed. *Id*. This means that when Daniel Ficker was killed, Mindek and Craska had not been trained on probable cause determinations for 14 years and 12 years, respectively.

### C. The City's Training in the Use of Intermediate Force Weapons Is Inadequate.

Craska's and Mindek's training in the use of intermediate force weapons also played into the needless escalation of the events leading to Daniel Ficker's death. Though the City espouses policies on training officers in the use of force continuum, both Mindek's and Craska's testimony makes clear that this training is inadequate. Craska and Mindek both failed to recognize that the first attempt to use a taser on Daniel did not work – *not* because he was superhuman – but because only one of the taser prongs made contact. Ex. C, Parma P.D. Investigation at 25. Craska then opted not to try to tase Daniel again because replacing the cartridge could require fumbling around – de facto evidence that he was not competent in taser use. He also opted not to use the taser in drive stun mode. Instead, he chose to throw the taser aside in the grass. ECF 39-1, Craska Dep. at

5

155:19-156:17, 157:6-25. Mindek, who was also armed with a taser and a gun (ECF 39-2, Mindek Dep. at 39:7-8), opted not use his taser because he "saw it didn't work on him once," and because "there are some people it just doesn't affect." Mindek asserted that seeing the taser not work once was enough to know it would not work if deployed again. *Id.* at 74:2-14. Neither Craska nor Mindek were competent in taser use.

As noted in the CDP IAU Investigation Report, G.P.O. 2.1.06 states that "when a first taser shot does not make contact, or is ineffective, the same or another officer may attempt additional shots as needed or practical in order to make successful contact on a subject." The IAU Investigation asserted that Mindek's decision not to use his taser contradicted CDP policy. Ex. B, CDP IAU Investigation Report at 34-35. *See also* CDP General Police Order 2.1.06, "Taser – Electronic Control Device (ECD)" [Plaintiffs' Exhibit O] at II.E and III.L.  It follows that Craska's decision not to use his taser again by reloading it, or in drive stun mode, also went against CDP policies to tase again as needed or as practical.

Additionally, Craska explained that he was averse to using other intermediate force weapons. He left his pepper spray in the car because he finds it to be "very ineffective" and he doesn't "like using it." He stated that it was his personal choice not to use this intermediate force weapon. ECF 39-1, Craska Dep. at 160:22-161:22. He further noted that he chooses not to carry a baton on his belt, either, because it is "not a weapon that [he's] comfortable using." Craska stated that, "We don't train on it nearly often enough for -- to be effective with it. I'm not comfortable using it. It's my own personal decision to not use it." *Id.* at 161:23-162:18. Nonetheless, he had those weapons available to him on July 3-4, 2011, stated that he chose not to use them. *Id.* at 162:19-23. The only other weapons available to him were "hands, feet, pistol." *Id*. at 163:8.

6

Training on carrying and using intermediate force weapons, providing a middle ground to hand-to-hand struggle and deadly gunshot, was plainly inadequate. This issue, combined with the unqualified permission Craska and Mindek received for their vigilante trip to Parma, the utter lack of supervision, and the lack of policy guidance on how to handle out-of-jurisdiction police matters, created an environment of constitutional rights violations just waiting to happen.

**D. The City Failed to Supervise Craska and Mindek, Pursuant to Violations of Its Own Policies on Use of Force Investigations and Internal Affairs-Recommended Discipline.**

Finally, the City asserts that its supervisory obligations are satisfied because of G.P.O. 2.1.01, which addresses the investigation of "all forms of deadly force," and applies to "all use-of-deadly-force incidents." *See* ECF 41-5, CDP G.P.O. 2.1.01, "Use of Force" at §V; ECF 41-8, Declaration of Bruce Cutlip, at ¶4. Allegedly all use-of-deadly-force incidents are "fully investigated by members of U.D.F.I.T., which includes supervisors from the Internal Affairs Unit who simultaneously monitor the integrity of the U.D.F.I.T. investigation. *Id*. at ¶5. Curiously, the City did not actually conduct the use of deadly force investigation in this incident. Instead, Parma Police investigated deadly force and the CDP only conducted the administrative Internal Affairs Unit review. *See* Ex. L, CDP IAU Investigation, Integrity Section at Bates 1.

Nonetheless, the CDP IAU found Mindek and Craska violated numerous policies, orders, and rules, and recommended both of them for discipline. The recommendation for Mindek's discipline even went as far as to request evaluation for termination. *See*. Ex. The City has opted not to undertake these disciplinary recommendations at this time, instead choosing to stay discipline until the instant case is over. *See* ECF 41-11, Expert Report of Melvin Tucker, at Appendix H, Letter to Pat D'Angelo on Stay of Discipline.

7

### III.     STANDARD OF REVIEW

On a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) ("[T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff upon the evidence present.") Summary judgment is appropriate only when the movant demonstrates conclusively that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

### IV.     APPLICABLE LAW AND ARGUMENT

Plaintiffs assert that the City of Cleveland is liable for Daniel Ficker's injuries. To succeed on a claim for relief under § 1983 against a municipality, a plaintiff must prove that his "constitutional rights were violated and that a policy or custom of the municipality was the moving force behind the deprivation of the plaintiff's rights." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir.2010) (internal quotation marks omitted). Plaintiffs assert that the City, in fact, was the moving force behind the deprivation of Daniel's rights.

#### A.  Daniel Ficker's Constitutional Rights Were Violated by Defendants Craska and Mindek.

Defendants Craska and Mindek did, in fact, violate Daniel Ficker's constitutional rights. To establish this prong of the *Monell* liability, Plaintiffs incorporate all arguments made in their separate Oppositions to Defendants Mindek's and Craska's Motions for Summary Judgment.

8

**B.  The City's Customs, Policies, and Practices Were the Moving Force Behind Craska's and Mindek's Violations of Daniel Ficker's Constitutional Rights.**

To make a successful failure to train claim, the plaintiff must prove that: "1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006).

**1.The City's Lack of Policy Training Regarding the Supervision and Conduct of Officers Concerning Out-of-Jurisdiction Police Matters Was Inadequate and Amounts to Deliberate Indifference.**

The City's lack of policy training regarding the supervision and conduct of officers concerning out-of-jurisdiction police matters was inadequate and amounts to deliberate indifference. In this case, the same factors which make this policy inadequate also demonstrate how it amounts to deliberate indifference. Establishing a City's deliberate indifference generally requires "[a] pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011). However, the Supreme Court did "le[ave] open the possibility that in a narrow range of circumstances, a pattern of similar violations might not be necessary," (*Id.* at 1361) if the constitutional harm is a "patently obvious consequence of the deficiency in the training program." *Siler v. Webber*, 443 F.App'x. 50, 55 (6th Cir. 2011) (citing *Connick,* 131 S.Ct. at 1361.)

The Northern District of Ohio found such a set of facts in *Robinson v. Barrow*, 1:11-CV-01609, 2012 WL 864045 (N.D. Ohio Mar. 13, 2012) [attached as Plaintiffs' Exhibit O]. Robinson was a corrections officer at a women's prison in Ohio. Robinson was posted at a perimeter fence to guard a breach in the fence from a car accident. Robinson was joined by another C.O. at the perimeter. Two unmarked Cleveland Police vehicles arrived at the breach, and undercover Cleveland police officers who were not in uniform exited vehicles and confronted Robinson and

9

the other C.O. Robinson pointed to his I.D. badge to show he was a corrections officer, but as the undercover officers approached, Robinson placed his hand on his weapon and ordered them to back away. One the police officers then drew his gun and pointed it at Robinson, while the other police officer grabbed for Robinson's gun. Two more undercover officers joined in the confrontation and assaulted Robinson to the point of unconsciousness and handcuffed him. *Robinson* at 2-3. Robinson brought a claim against the City, alleging that the City failed to adequately control, train, supervise or discipline the officers, and that this failure to train caused his injuries. *Id.* at 7.

The Court found that Robinson presented evidence that City's failure to train its plain-clothed officers falls within the "narrow range of circumstances" beyond a pattern of constitutional violations which lead to municipal liability. *Id*. at 8-9. Discovery revealed that only one officer recalled any instruction in interaction with plain-clothed and uniformed officers, and the City only presented a policy on this issue for the first time its reply brief for summary judgment, and it was therefore questionable as to whether officers were instructed on that procedure. *Id*. Further, Robinson's expert opined that the individual officers violated well-established plain clothes law enforcement procedures. Thus, the Court found genuine issues of material fact, which precluded summary judgment.  *Id*. at 9.

*Robinson* built on the idea that the risk of a constitutional violation arising under circumstances where police are given absolutely no guidance on how to conduct themselves in the face of heightened or different risks leads to a "risk of a constitutional violation arising as a result of the adequacies in the municipal policy [being] 'plainly obvious.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006), citing *Bd. Of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997). The Supreme Court stated:

> [I]t may happen that in light of the duties assigned to specific officers or employees **the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been indifferent to the need.** (Emphasis added).

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). The Court has thus articulated, and *Robinson* followed, that what amounts to a per se rule that deliberate indifference can be presumed from a finding of inadequate training in the supervision of and authority granted to officers who are operating outside of their jurisdictions.

In fact, the instant case is closely analogous to *Robinson*. The City did not have a written policy on supervisory requirements for permission to leave the jurisdiction, for supervision once officers were outside of the jurisdiction, or for officer conduct outside of the jurisdiction. Former Chief McGrath explicitly states that the City had <u>no</u> specific policy and procedure in regard to division personnel leaving the city and conducting police matters. Ex. M, McGrath Dep. at 39:14-40:1. Lieutenant Bruce Cutlip additionally acknowledged this policy and practice failure in the CDP's Internal Affairs Unit Administrative Review (regarding the circumstances surrounding Mindek's and Craska's actions on July 3 and 4, 2011). After reviewing this incident in its entirety, Lt. Cutlip specifically requested that "divisional policies be reviewed and updated in regards to divisional personnel leaving the city and conducting police matters." *See* Ex. A, CDP IAU Administrative Review at 3.

Any police department, particularly one of the City's size, had reason to consider this type of scenario and the potential dangers involved, and to adopt policies to deal with them. The City reasonably should have known of its obligation to train and supervise officers who operate outside Cleveland's jurisdiction. Therefore, the failure of the City's officers to respect any operating and reporting procedures when outside of Cleveland's jurisdiction, and the failure of a supervisor to actually supervise in this scenario, gives rise to the reasonable inference that the officers

11

themselves had not received training, had received inadequate training, or had not been sufficiently trained to take seriously this circumstance and implement their training, regarding trips outside the city.

There was no policy, and therefore no guidance, for supervisors on how to approach out-of-jurisdiction trips. Because there was no guidance for supervisors, there was no guidance or actual supervision for officers who conducted police matters outside of their jurisdictions.  The lack of policy on this issue led directly to Daley's <u>and</u> Craska's lax approach for arranging the vigilante mission to Parma.  ECF 39-3, Daley Dep. at 26:15-18; ECF 39-1, Craska Dep. at 233:1-9. Sgt. Daley granted permission to Craska to go to Parma without asking any questions. He operated on a mere inference that Craska was going to Parma to investigate criminal activity, and was unaware whether he was going alone or with a passenger, whether the situation would be dangerous, whether he needed backup, and did not ask why he needed to leave the City of Cleveland on a busy night. ECF 39-3, Daley Dep. at 21:21-25:21. Craska confounded the situation when he failed to communicate himself that an off-duty officer (Mindek) was the complainant in the case, that he was taking the complainant along on his trip to Parma, or that the trip might involve a confrontation, interaction, or interview with a possible suspect. Ex. B, CDP IAU Inv. At 5, 8-9. Of course, Officer Mindek also failed to notify any supervisor, or to call 911 dispatch regarding the theft, and he also failed to inform anyone that he was going to accompany Craska or ride along in a city police vehicle. *Id*. at 33, 35.

As a result, Officers Craska and Mindek had free reign and no standards on how to approach their police duties while in Parma. They were untrained in how to respond to the different context of their diminished authority while operating in another jurisdiction: as Tiffany Urbach and Daniel Ficker did, civilians might question the officers' authority outside of their own

12

jurisdiction. Civilians might be hesitant to respond to officers whose authority they are questioning.  Craska and Mindek were additionally untrained in the legal limitations of their actions outside of the City of Cleveland. Operating in another jurisdiction presents unique dynamics. Mindek and Craska were unprepared to handle those nuances.

Plaintiffs' Expert, Melvin Tucker, opines that the violations of Daniel Ficker's rights occurred at the hands of officers who operated unlawfully outside their jurisdiction. National police practices generally dictate that officers do not have authority to take enforcement action outside his primary jurisdiction, unless: (1) he is engaged in a fresh pursuit of a suspect; (2) he is operating under a mutual-aid agreement giving him authority at the location outside his primary jurisdiction; or (3) he witnessed a serious and life threatening crime, which generally grants him authority to detain a criminal suspect until an officer from within the foreign jurisdiction arrives to make an arrest. ECF 41-11, Expert Report of Melvin Tucker at 7. Chief McGrath also confirmed that Cleveland officers do not have authority to conduct law enforcement actions outside the City. There was no mutual-aid agreement in place with Parma when Craska and Mindek went into Parma to confront Daniel Ficker; nor did they advise Parma of their purpose in Parma.  They were not operating under emergency circumstances. They were not in fresh pursuit of Daniel Ficker. Therefore, they had no lawful authority to take any action in Parma. *Id*.

Craska and Mindek had no guidance from policy or training, and no supervision, on how to lawfully conduct themselves in another jurisdiction, leading to their decision to pursue Daniel, unlawfully detain him, beat him up, and eventually to shoot him. While the lack of policy and supervision on a trip to Parma in and of itself was <u>not</u> a constitutional violation, the fruit of the lack of policy and supervision led directly led to the poorly calculated actions that Craska and Mindek took when they got to Parma.  Plaintiffs assert that, as in *Robinson*, this lack of policy was

13

both inadequate and amounts to deliberate indifference, and the City was the moving force behind the violation of Daniel Ficker's constitutional rights. This inadequacy was closely related to and/or actually caused Daniel's injuries and eventual death. Material issues of fact remain, and these issues must be left for jury to decide. The City's Motion for Summary Judgment should be denied.

### 2. The City's Policies on Use-of-Deadly-Force Investigations and Internal Affairs Unit Administrative Reviews Cannot Be Used as Evidence of Adequate Supervision.

The City cites its policies on the use of force and use-of-deadly-force (U.D.F.I.T) investigations as evidence of adequate supervision, as discussed in the City's Statement of Facts. The City fails to mention that, in fact, the City did not conduct an U.D.F.I.T. investigation in this case. Instead, the City deferred to Parma and accepted, without question, that Parma's conclusion that Defendant Craska's shooting of Daniel Ficker was justified. The City did not assess the shooting independently. *See* Ex. L, CDP IAU Investigation, Integrity Section at Bates 1. Citing to the U.D.F.I.T. investigations policy as evidence of supervision in this case was disingenuous.

The City did undertake an administrative review of the officers' conduct in this case. Sgt. Daley (who now faces criminal charges for his supervisory work during the widely-publicized 2012 car chase that ended in the deaths of two individuals caused by 137 shots fired by Cleveland police) was not recommended for discipline, despite his lax grant of permission and lack of supervision. Nonetheless, on September 13, 2012, both Mindek and Craska were recommended for administrative discipline, and Mindek recommended for evaluation for termination, as a result of their conduct leading to the death of Daniel Ficker. Ex. L, CDP IAU Integrity Section at Bates 1. However, that discipline has yet to be administered: the City agreed on November 14, 2012 to stay discipline until this case concludes, including any related appeals. *See* ECF 41-11, Expert Report of Melvin Tucker, at Appendix H, Letter to Pat D'Angelo on Stay of Discipline. As opined

by Plaintiffs' Expert, Melvin Tucker, this stay demonstrates the ongoing nature of the City's lack of supervision in regard to these officers, and its disregard for the safety of any civilians with whom Mindek or Craska came into contact in their capacity as police officers until the date that discipline is finally handed down. *Id*. at 10. Craska and Mindek were not and have not been subjected to discipline by their superiors for their misconduct. Thus, evidence of the IAU administrative review cannot be cited by the City as evidence of adequate supervision. The lack of independent investigation and discipline instead indicate the City's acquiescence in Craska's and Mindek's violations of Daniel Ficker's constitutional rights.

### 3. The City's Inadequate Training in Probable Cause Determinations Amounts to Deliberate Indifference.

The City is also responsible for inadequate and deliberately indifferent training on probable cause determinations. Mindek's and Craska's confusion over what satisfied reasonable suspicion and probable cause was obvious in their depositions. ECF 39-1, Craska Dep. at 103:13-17; ECF 39-2, Mindek Dep. at 113:16-115:13. CPD officers only receive training on probable cause determinations in the academy. The City admits that they receive no additional or refresher training on this issue once they join the force as full-fledged officers. ECF 41-7, Declaration of Brandon Kutz at 6. In cases where officers are on the force for some time, such as Mindek (Cleveland Police Academy in 1997) and Craska (Cleveland Police Academy in 1999), they receive no additional probable cause training after their time at the academy is completed. *Id.* This means that when Daniel Ficker was killed, Mindek and Craska had not been trained on probable cause determinations for 14 years and 12 years, respectively.

Plaintiffs' Expert Melvin Tucker opined that Craska and Mindek were not properly trained on the concept of reasonable suspicion, leading them to an erroneous conclusion about their authority with regard to detaining Daniel, and thus has no authority to (1) detain Daniel; (2)

15

conduct a pat-down (frisk) of Daniel; or (30 to arrest Daniel. *See* ECF 41-11, Expert Report of Melvin Tucker at 5. Tucker notes that even the Cleveland Police Department Internal Affairs Investigation concluded that Craska and Mindek did not have evidence to make Daniel a named suspect in a report. *Id*. at 6. Tucker concluded:

> It should have been obvious to the leadership of the Cleveland Police Department in 2011 that their officers would need to detain suspects for further investigation into criminal acts and arrest suspects for committing criminal acts. It should also have been obvious to the leadership of the Cleveland Police Department that their officers would be tasked with making decisions as to whether sufficient evidence existed to detain a suspect for further investigation into a criminal act or whether sufficient evidence existed to arrest a person for a criminal act. Because that should have been obvious to the leadership of the Cleveland Police Department, it should also have been obvious that their officers needed to be properly trained on what constitutes sufficient evidence to establish reasonable suspicion and probable cause.

*Id.* at 6. Both Craska and Mindek simultaneously demonstrated their obvious lack of training during their interactions with Daniel Ficker. Though proof of a single incident of unconstitutional activity is not typically sufficient to impose liability under *Monell*, where more than one officer simultaneously violates accepted standards in a municipal liability claim, a genuine issue of material fact exists and summary judgment is prohibited. *Diaz v. Salazar*, 924 F. Supp. 1088, 1099 (D.N.M. 1996). Here, Plaintiffs present evidence that both Craska and Mindek deviated from department standards, widely-accepted standards, and constitutional obligations. This inadequate training amounts to deliberate indifference, and was closely related to and/or actually caused Daniel's injuries. Thus, disputed issues of material fact remain and summary judgment for the City must be denied.

### 4. The City's Inadequate Training in Use of Intermediate Force Weapons Amounts to Deliberate Indifference.

As with the issue of probable cause determinations, both Defendant Craska and Defendant Mindek simultaneously deviated from department standards in their use of intermediate force

16

weapons. This issue was critical to Daniel Ficker's death because, as Craska noted, the only options after eliminating the intermediate force weapons available to control the situation were "hands, feet, pistol." ECF 39-1, Craska Dep. at 163:8.

Both Mindek and Craska were incompetent in regard to using their tasers. *See* ECF 39-1, Craska Dep. at 155:19-156:17, 157:6-25; ECF 39-2, Mindek Dep. at 39:7-8, 74:2-14; Ex. B, CDP IAU Investigation Report at 34-35; Ex. O, General Police Order 2.1.06 at II.E and III.L. Craska also admitted to choosing not to keep his pepper spray or baton on his person. He did not like using the pepper spray and was not comfortable using the baton because "[w]e don't train on it nearly often enough for -- to be effective with it. I'm not comfortable using it. It's my own personal decision to not use it." Craska had intermediate force weapons available to him, but opted not the use them. *See* ECF 39-1, Craska Dep. at 160:22-162: 23. Thus, after allegedly exhausting the use of his hands and feet, his only other option was his pistol. A pistol remaining as the singular option was the direct result of inadequate training.

Though the City proffered multiple affidavits and documentation (asserted by the City as fact) that allegedly relieve the City of liability for a failure to train in use of force, these documents demonstrate that the City's policies are inadequate to deal with the events of this case in conjunction with the factual circumstances. Moreover, the City offers no evidence that the policies contained in its documentation are actually fulfilled as written, an issue the facts of this case show to be highly questionable. This inadequate training amounts to deliberate indifference, and was closely related to and/or actually caused Daniel's injuries. Thus, genuine issues of fact remain and summary judgment must be denied.

17

## V.    CONCLUSION

When the content and adequacy of the training program are in dispute in a municipal liability claim, the City is not entitled to summary judgment. *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1983). This evidence must be evaluated by the trier of fact, who must then apply the Fourth Amendment objective reasonableness standard based on *Graham v. Connor*, 490 U.S. 386 (1989). Here, the adequacy and content of the City's training for police officers is in dispute on a number of issues, including whether Craska and Mindek were subject to adequate supervision and training or any supervision or training at all when they went to Parma and while they were there, as well as whether training on lawful seizures and use of intermediate force weapons was adequate. Thus, Plaintiffs respectfully request that this Court deny Defendant City of Cleveland's Motion for Summary Judgment.

Respectfully submitted,

FRIEDMAN & GILBERT

s/ Terry H. Gilbert
TERRY H. GILBERT (0021948)
GORDON S. FRIEDMAN (0021946)
55 Public Square, Suite 1055
Cleveland, OH 44113-1901
Telephone:     (216) 241-1430
Facsimile:     (216) 621-0427
E-Mail:        tgilbert@f-glaw.com
               gorlaw@f-glaw.com

Attorneys for Plaintiffs

**COMPLIANCE WITH PAGE LIMITATIONS**

The undersigned certifies that the case *Bernadette Rolen, Etc., et al. v. City of Cleveland, et al.*, is currently on the standard track. The undersigned certifies also that the above Memorandum in Opposition to Defendant City of Cleveland's Motion for Summary Judgment complies with the page limitations set forth in Loc. R. 7.1(f).

s/ Terry H. Gilbert
TERRY H. GILBERT (0021948)
One of the Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Terry H. Gilbert
TERRY H. GILBERT (0021948)
One of the Attorneys for Plaintiffs

19