# Plaintiffs' Exhibit M

# Deposition of Chief Michael McGrath

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


Bernadette Roland, et al., )
                           )
           Plaintiffs,     )
                           )
   -vs-                    )        CASE NO. 1:12 cv 1914
                           )
City of Cleveland, et al., )
                           )
           Defendants.     )
                           )


                 -  -  -  -

    Deposition of Chief Michael McGrath, taken as if upon

examination before Denise L. Kautzman, a Notary Public

within and for the State of Ohio, at the offices of

Friedman & Gilbert, 55 Public Square, Suite 1055,

Cleveland, Ohio, at 9:30 a.m. on Friday, September 20,

2013, pursuant to notice and/or stipulations of counsel.

                 -  -  -  -


                 TACKLA & ASSOCIATES
                1021 OHIO SAVINGS PLAZA
                 1801 EAST 9TH STREET
                 CLEVELAND, OHIO 44114
                    216-241-3918
                   Fax 216-241-3935

 1   APPEARANCES:

 2             ON BEHALF OF THE PLAINTIFFS

 3   Terry H. Gilbert
     Friedman & Gilbert
 4   55 Public Square
     Suite 1055
 5   Cleveland, Ohio 44113
     216-241-1430
 6   Tgilbert@f-glaw.com

 7   Gordon S. Friedman
     Friedman & Gilbert
 8   55 Public Square
     Suite 1055
 9   Cleveland, Ohio 44113
     216-241-1430
10   Gorlaw@f-law.com

11             ON BEHALF OF THE DEFENDANTS

12   Awatef Assad
     Department of Law
13   601 Lakeside Avenue
     Room 106
14   Cleveland, Ohio 44114
     216-664-2716
15   Aassad@city.cleveland.oh.us

16   John P. Bacevice Jr.
     Department of Law
17   601 Lakeside Avenue
     Room 106
18   Cleveland, Ohio 44114
     216-664-2807
19
     Shawn M. Mallamad
20   Department of Law
     601 Lakeside Avenue
21   Room 106
     Cleveland, Ohio 44114
22
     Thomas J. Kaiser
23   Department of Law
     601 Lakeside Avenue
24   Room 106
     Cleveland, Ohio 44114
25   216-664-2800

1      (Continued Appearance)

2   ALSO PRESENT:

3      Tiffany Urbach

4      Dennis Ficker

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2   EXAMINATION OF
     CHIEF MICHAEL MCGRATH
 3   BY MR. GILBERT                        5/10

 4

 5   EXHIBIT 1                             22/8

 6   EXHIBIT 2                             29/12

 7                        - - -

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        PROCEEDINGS

 2                           -  -  -

 3                        -   -   -   -

 4              (Thereupon, Plaintiff's Exhibits 1 and 2 were

 5              marked for purposes of identification.)

 6                        -   -   -   -

 7              CHIEF MICHAEL MCGRATH, of lawful age, being

 8    first duly sworn, testified upon his oath as follows:

 9              EXAMINATION OF CHIEF MICHAEL MCGRATH

10    BY MR. GILBERT:

11       Q.  Good morning.

12       A.  Good morning.

13       Q.  We've met.  Terry Gilbert.

14       A.  Yes.

15       Q.  Gordon Friedman.  We represent the estate of

16    Daniel Ficker in this federal lawsuit that's pending now

17    in court.  Thank you for appearing today.  I have a few

18    questions for you about the case, and about your role as

19    chief.

20          I don't know if you've ever had your deposition

21    taken before.  But I'm going to ask you some questions.

22    If you don't understand the question, don't hesitate to

23    ask me to clarify the question; is that fair enough?

24       A.  Yes, sir.

25       Q.  And the court reporter has to take down audible
```

1  answers, not nods --

2      A.  Yes, sir.

3      Q.  -- and shakes of the head, okay?

4      A.  Yes, sir.

5      Q.  Would you please state your name?

6      A.  Michael McGrath, M-C-G-R-A-T-H.

7      Q.  And what is your current occupation?

8      A.  Chief of police for the division of police, City

9  of Cleveland.

10         MR. GILBERT:  Come on in.  We just started.

11      Q.  And how long have you been the chief?

12      A.  Eight and a half years.

13      Q.  Can you give us a quick rundown on your career in

14  law enforcement?

15      A.  I've been a police officer for 40 years.

16  Thirty-three years with the City of Cleveland.  Prior to

17  that I worked for the City of East Cleveland.

18         When I came to Cleveland I started out in patrol.

19  I went to the Detective Bureau and was promoted.

20  Assigned to the Fourth District.  A few years later

21  assigned to the SWAT Unit.  Supervisor in the SWAT Unit

22  for 11 years, at which time I was commander of the

23  Fourth District by Mayor White.  I was in that position

24  eight years.  And was appointed Chief of police by Mayor

25  Campbell eight and a half years ago.

1    Q.  And what is the job description of a chief of

2  police for the City of Cleveland, just generally

3  speaking?

4    A.  It's not generally speaking.

5    Q.  I mean the short answer.

6    A.  Short answer is I manage the division of police

7  and all of the employees thereof.

8    Q.  All right.  Your responsibilities would be to be

9  the ultimate enforcer of rules and regulations of

10  personnel within the department, would that be one of

11  your duties?

12    A.  One of my duties would be to ensure that the

13  supervisors implement the policies and procedures of the

14  division of police.

15    Q.  Let me ask you this:  When did you become aware

16  of the shooting in Parma, involving Dan Ficker?

17    A.  I can't give you a specific time, but it was the

18  evening of.

19    Q.  How did you learn about the shooting?

20    A.  By phone.

21    Q.  And do you remember who called you?

22    A.  No, sir.

23    Q.  And what was it, just to tell you that there was

24  an incident involving Cleveland police officers?

25    A.  That's correct.

1    Q.  And what did you do after, if anything, after you

2  got that information?

3    A.  I ensure that our UDFIT respond to location,

4  that's the team that investigates deadly force

5  incidents.

6    Q.  By the way, prior to coming into this deposition

7  did you review any documents?

8    A.  I reviewed the synopsis of the Internal Affairs

9  document.

10   Q.  Have you reviewed the Internal Affairs document

11  itself, the entire file?

12   A.  No, sir.  I did not review the entire file.

13   Q.  Did you review the investigative report prepared

14  by the Internal Affairs?

15   A.  Yes, sir.

16   Q.  Was that recently that you did this, reviewed

17  these documents?

18   A.  Yes, sir.  This week.

19   Q.  Okay.  Had you seen those documents earlier on,

20  before the deposition preparation?

21   A.  Yes, sir.  I reviewed the documents when they

22  were completed by the Internal Affairs Unit,

23  approximately two years ago, I think.

24   Q.  So just for the record, what does the UDFIT mean?

25  What does that mean?

1    A.  That's the Use of Deadly Force Investigative

2  Team.  Use of Deadly Force Investigative Team.

3    Q.  And give me your understanding of what that team

4  does?

5    A.  That team responds to the location to investigate

6  those deadly force incidents within the City of

7  Cleveland.

8    Q.  Okay.  And what do they investigate?  What's

9  their mission?

10    A.  Their mission is to investigate the incident

11  which took place.

12    Q.  And for what purpose?

13    A.  For the simple purpose of presenting it to the

14  prosecutor at some point when the investigation is

15  completed.

16    Q.  The prosecutor has jurisdiction over criminal

17  cases, correct?

18    A.  Yes, sir.

19    Q.  All right.  So the investigation -- and I'm not

20  trying to put words in your mouth.  But is the

21  investigation designed to determine whether or not there

22  are violations of criminal statutes?

23    A.  Yes, sir.

24    Q.  All right.  Does the Use of Deadly Force

25  Investigation Team look to see if any rules or

1  procedures or regulations have been violated

2  administratively?

3      A.  No, sir.

4      Q.  Who does that?

5      A.  The integrity control section.

6      Q.  Okay.  And before I get into that, how are

7  members of UDFIT selected to be in that particular unit

8  or team?

9      A.  Or team.  The UDFIT team is -- we have a manual

10 for the UDFIT team that determines the people that are

11 assigned to that particular response team.  It's in our

12 manual.

13     Q.  Okay.

14     A.  So it's representatives from the Homicide Unit,

15 representatives from crime scene.  It's also

16 representatives that respond from the integrity control

17 section.

18     Q.  And this team approach has been in existence for

19 how long, approximately?

20     A.  Approximately 2002.

21     Q.  Okay.  Now, you've indicated that the team, we'll

22 just call it the team for now, responds and investigates

23 incidents of deadly force within the City of Cleveland,

24 correct?

25     A.  Yes, sir.

1    Q.  All right.  Is there a protocol or guidelines or

2  any kind of written procedures if a Cleveland officer is

3  involved in a shooting in another jurisdiction?

4    A.  There -- yes, sir.

5    Q.  Explain that.

6    A.  If a Cleveland officer is involved in a deadly

7  force incident in another jurisdiction, that particular

8  jurisdiction does the investigation.

9    Q.  And where is that notion?  Is it written

10  somewhere, regarding what you just said?

11    A.  It's the law.  I mean, Cleveland officers can't

12  go to another jurisdiction and investigate a deadly

13  force incident there.  We don't have jurisdiction to do

14  that.

15       We respond, just to supply them with information,

16  meaning the other jurisdiction.  And to monitor it.  But

17  that particular investigation has to be conducted by the

18  jurisdiction where it took place.

19    Q.  All right.  And regardless of how competent or

20  experienced that other jurisdiction is, you -- is it

21  your understanding that you have to live with that?

22    A.  We have to defer to the jurisdiction where the

23  incident took place to conduct the criminal

24  investigation.

25    Q.  All right.  And do you -- does your team provide

1   any kind of assistance or support to the other

2   jurisdiction in doing the investigation, or do you leave

3   it all to them?

4       A.  We leave the investigation to the other

5   jurisdiction.  But if they need additional information

6   from us, they would get that information through the

7   UDFIT team.

8       Q.  Do you agree -- I guess what I'm asking is that

9   you defer to them to make investigatory decisions

10  regarding that case?

11      A.  Yes, sir.  That is correct.

12      Q.  That would include what witnesses they talk to,

13  correct?

14      A.  Correct.

15      Q.  Any evidentiary crime scene investigation, you

16  leave it up to them?

17      A.  Yes, sir.

18      Q.  In this particular case you indicated that the

19  UDFIT team responded, correct?

20      A.  Yes, sir.

21      Q.  Do you know what happened with what they did when

22  they got there?  Do you have first-hand knowledge of

23  what happened?

24      A.  I do not have first-hand knowledge as to what

25  they did when they arrived.

1    Q.  Did any member of the team get back to you and

2  explain what they learned and what they knew about the

3  situation early on?

4    A.  I don't recall.

5    Q.  All right.  Now, the investigation that is done

6  by the other jurisdiction is geared toward the

7  presentation by the prosecutor, perhaps to a Grand Jury,

8  correct?

9    A.  Yes, sir.

10    Q.  All right.  Now, the scope of those

11  investigations are criminal in nature, not

12  administrative, correct?

13    A.  Correct.

14    Q.  Okay.  And what is the procedure within the

15  Cleveland Police Department regarding deadly force

16  situations and other jurisdictions, insofar as looking

17  at that shooting and determining whether administrative

18  discipline might be involved?

19          MR. KAISER:  Terry, let me have an objection

20  to the administrative rules, regulations, discipline on

21  relevance grounds, because administrative rules don't

22  define the constitutional standard that brings us to

23  court in this matter.  And if you would like to let me

24  have a continuing objection, I won't interrupt your

25  transcript as much as I otherwise might.

Page 14

1          MR. GILBERT:  I appreciate that.

2          MR. BACEVICE:  Can I have the same

3    objection?

4          MR. GILBERT:  Yes, you can.

5          MS. ASSAD:  I also give an objection.

6          MR. GILBERT:  Okay.

7          MR. MALLAMAD:  And I also object.

8    Q.  Can you answer the question?

9    A.  Could you repeat the question, please?

10         MR. GILBERT:  Can you read that?

11              -  -  -  -

12    (Thereupon, the requested portion of

13    the record was read by the Notary.)

14              -  -  -  -

15    A.  Deadly force incidents involving Cleveland police

16    officers that take place outside of the City of

17    Cleveland are investigated by that jurisdiction, and

18    after the initial incident, are monitored by my

19    integrity control section.

20    Q.  So the integrity control section could review the

21    other jurisdiction's investigation, and make

22    recommendations as to whether any violations of policy

23    occurred, correct?

24    A.  Not exactly.

25    Q.  Explain.

1    A.  What they would do is monitor the other

2  jurisdiction's investigation, as far as the timeline

3  goes.  They wouldn't get involved in the investigation

4  per se, until it was completed through the judicial

5  process.

6    Q.  All right.  And then once the judicial process is

7  concluded, giving that process time to go through the

8  various stages, then the integrity control unit looks at

9  that use of force and determines whether any rules or

10  regulations or policy were violated?

11    A.  Yes, sir.

12    Q.  Okay.  Were you aware in this case whether that

13  procedure was done, what you just agreed to?

14    A.  Yes, sir.  It was completed.

15    Q.  Okay.  So my review, and correct me if I'm wrong,

16  was they just did not -- that they did not look at the

17  actual deadly force, they looked at everything involving

18  the Ficker case leading up to what happened in Parma, am

19  I right about that?

20    A.  The integrity control section, meaning the

21  Internal Affairs Unit within that section, would review

22  the entire investigative file that was completed by the

23  other jurisdiction, which would include the deadly force

24  incident, also.

25    Q.  Okay.  Because my understanding in reviewing

1    this -- and I don't want to get into a thorough detailed

2    analysis.  But the Internal Affairs looked at Craska and

3    Mindek, the officers involved, in their decision leading

4    up to the use of deadly force, and found various --

5    recommended various actions to be taken.  That was my

6    understanding.  Am I wrong?

7        A.  No.  That understanding is correct.

8        Q.  Okay.  And I didn't see any analysis regarding

9    the actual confrontation regarding Craska, Mindek and

10   Mr. Ficker as to whether the force used, and the deadly

11   force used, comported with the Cleveland Police

12   Department policy and procedure.  I didn't see that.  Am

13   I missing something?

14       A.  No.  I do know that the Internal Affairs Unit

15   looks at the entire investigation.  And if they don't

16   identify any rule violations in the deadly force

17   incident, they would not have been part of that report.

18   They identify the rule violations.

19       Q.  All right.  Now, you mention the Integrity

20   Control Section.

21       A.  Yes, sir.

22       Q.  What is that?

23       A.  The integrity control section is made up of three

24   units, the Internal Affairs Unit, the Inspections Unit,

25   and the Overtime Review Unit.  And Integrity Control is

1  -- their function is exactly what the term is, to

2  maintain the integrity of the division of police.

3     Q.  All right.  Did the Integrity Control Unit issue

4  an independent review, if you know, of the Internal

5  Affairs investigation and recommendations?

6     A.  To be more clear, so we have an understanding,

7  you have an integrity control section.  In that section

8  is Internal Affairs, Inspections, and Overtime Review.

9        When there's incidents involving Cleveland police

10  officers, that could possibly be criminal

11  investigations.  Those investigations are done by

12  Internal Affairs.

13     Q.  All right.  So they -- Internal Affairs is a

14  component of the Integrity Control Section, correct?

15     A.  Yes, sir.

16     Q.  All right.  So when the Internal Affairs finishes

17  its investigation, makes recommendations, that has the

18  stamp of the Integrity Control Section as well as the

19  Internal Affairs, am I --

20     A.  Correct.  Internal Affairs has completed their

21  review, their administrative review, relative to this

22  particular incident, it would go to their supervisor who

23  oversees the entire Integrity Control Section.  And he'd

24  do a synopsis on it after reviewing the file to ensure

25  that everything was completed properly.  And then they

1    would forward it up the chain of command.

2        Q.  And in this case involving the review of officers

3    Craska and Mindek, that chief -- was that Lieutenant --

4    was it Cumba?

5        A.  When this incident took place Lieutenant Cutlip

6    was the OIC, officer in charge, of the Internal Affairs

7    Unit.  The officer overseeing the entire Integrity

8    Control Section was Captain Louis Cumba.

9        Q.  Cumba, that's what I thought.  Okay.

10       Somewhere along the line, you had communications

11   -- did you have communications with any of the

12   investigators of the Internal Affairs on this case?

13       A.  No, sir.  I meet with the officer in charge of

14   the Integrity Control Section at least once every two

15   weeks.  And we go over all the cases that they're either

16   investigating or monitoring.  And they would update me

17   as to status of that particular investigation.

18       Q.  Okay.  Now, I read in the -- you know Evelyn

19   Montalvo, correct?

20       A.  Yes, sir.

21       Q.  And you are aware that she did the majority of

22   the investigative work?

23       A.  Yes, sir.

24       Q.  I read in the report that you might have

25   contacted her concerning something that you were

Page 19

1    concerned about.  Do you recall that?

2        A.  No, sir.  I don't.

3        Q.  On July 7th -- and I know you won't remember

4    dates.  But I'm looking at the report.  That you wanted

5    them to contact Sergeant Daley and order him to complete

6    a Form One.  Do you remember that?

7        A.  No, sir.

8        Q.  All right.  Do you recall whether there was a

9    concern about -- let me strike that.

10           This was -- this case was an unusual situation

11   because officers from Cleveland went to Parma to

12   investigate something, and wound up involved in a

13   shooting.  That is an unusual situation, is it not?

14       A.  Yes, sir.

15       Q.  Okay.  And would you agree with me that one of

16   the concerns that you might have had was how it could be

17   that an officer from the CSU Unit, along with an

18   off-duty officer, who was allegedly the victim of the

19   crime to be investigated in Parma, got permission to go

20   out there?  Was that a concern of yours?

21       A.  Sir, I'm not sure the word concern is the proper

22   terminology.  But in all cases involving deadly force

23   incidents within the division of police, I'm very

24   adamant that I want a thorough investigation, both

25   criminally and administratively.  And all correspondence

1    I have, relative to these incidents or investigations

2    through the chain of command, are with Captain Cumba.

3         But this incident in Parma, like all the other

4    incidents of deadly force in the City of Cleveland or

5    outside of the City of Cleveland, repeating myself, I'm

6    very adamant.  And I want a completed investigation.

7    Q.  All right.  And getting back to the specific area

8    of the -- getting all the facts associated with the

9    question of how it came about that these two officers

10   went to Parma, certainly is part of this investigation,

11   is it not?

12   A.  Yes, sir.

13   Q.  So it would not be -- it would not be unusual for

14   you to ensure that everything is followed through,

15   correct?

16   A.  Correct.

17   Q.  And it would not be unusual for you to call an

18   investigator, or contact an investigator from the

19   Internal Affairs, and ask them to follow up on a

20   particular area of inquiry, would it?

21   A.  It would be very unusual for me to specifically

22   contact the investigator.  Any questions I would have

23   concerning this investigation I would ask Captain Cumba.

24   Q.  Okay.  I don't think he's still working, is he?

25   A.  No, sir.  He's retired.

1    Q.  Okay.  But anyway the report you have in front of

2  you, it's on page eight, where it says July 7th.  Take a

3  look at it and see if it refreshes your recollection?

4    A.  Specifically, it does not.  But it wouldn't be

5  unusual for me to ask Captain Cumba, have you received

6  the Form One from Sergeant Daley yet?

7    Q.  And can you offer us a reason why that would be

8  important to get a Form One from Sergeant Daley?

9    A.  It would be important because Sergeant Daley was

10  the sergeant who was overseeing these CSU Units the

11  evening of the incident.  It's important to receive Form

12  Ones from all the supervisors that may have authority

13  over the police officers that are supervising it.  It is

14  normal procedure to get a Form One from that particular

15  supervisor.

16    Q.  Were you aware that it was Sergeant Daley that

17  supposedly gave permission to Officer Craska to leave

18  his CSU jurisdiction and go into Parma to investigate

19  something?

20           MR. MALLAMAD:  Objection.  You may answer,

21  Chief.

22    A.  During the course of the investigation, like all

23  other investigations, I am updated by -- I was updated

24  by Captain Cumba.

25    Q.  All right.  Well, my question was, were you aware

 1    that Sergeant Daley supposedly gave the permission for

 2    Craska to go to Parma?

 3        A.  Yes, sir.

 4        Q.  Okay.  So that would be an important area to tie

 5    down facts surrounding that supposed authorization,

 6    correct?

 7        A.  It's part of the investigative process, yes.

 8        Q.  Showing you Exhibit 1, have you seen this

 9    document before?  It's two pages.  Unfortunately it is a

10    very poor copy, and that's the way we got it.

11        A.  After reviewing this document, I do recall it.

12        Q.  All right.  And do you see at the bottom of the

13    first page the OIC signature?

14        A.  Yes, sir.

15        Q.  And that's Captain Cumba, the head of the

16    Integrity Control --

17        A.  Yes, sir.

18        Q.  -- Section?

19        A.  Yes, sir.

20        Q.  Okay.  And then on the second page there's some

21    writing there?

22        A.  Yes, sir.

23        Q.  And it's the Chief's orders, see that?

24        A.  Yes, sir.

25        Q.  And it looks like there's some writing,

1    administrative charges only.  And it looks like there is

2    something there.  Do you remember, even when you review

3    documents -- because we don't have the originals here.

4    And this is the way it came to us from your lawyers.  So

5    do you recall what box was checked?

6         A.  Yes, sir.

7         Q.  Which one was checked?

8         A.  Administrative charges.

9         Q.  All right.  And under Chief's signature, would

10   that fuzzy looking area, would that be your signature?

11        A.  Yes, sir.

12        Q.  Okay.  At this point, without going into the

13   whole document, can I just ask you if you understood

14   that there were recommended administrative discipline

15   measures regarding both of these officers?

16        A.  Yes, sir.

17        Q.  And Captain Cumba -- and if you look at the first

18   page at the bottom text, Captain -- not there.  Where it

19   says, I recommend.

20        A.  Yes, sir.

21        Q.  Okay.  And I'm quoting right now, I recommend

22   administrative discipline is outlined by Sergeant

23   Montalvo and Lieutenant Cutlip for the two officers.  In

24   addition, PO Mindek exhibited cowardly behavior and

25   should be evaluated for incrimination of the division.

1  His actions contributed to the use of deadly force on

2  alleged suspect, Daniel Ficker.

3       This is a summary, really, of more detailed

4  recommendations in Evelyn Montalvo's report, correct?

5     A.  Correct.

6     Q.  She went in a lot more detail about the

7  violations she found to have occurred in connection with

8  this case?

9     A.  Yes.

10     Q.  Correct?  So explain to me what your signature

11  means on this document.  What does it trigger?  What

12  does it set in motion?

13     A.  My signature on this document tells them to

14  proceed with administrative charges.

15     Q.  Okay.  And then what happens after that?

16     A.  And then it goes to my charging officer, who

17  processes the charging papers on the recommendations of

18  Internal Affairs Unit report.

19     Q.  All right.  And that's let's carry it out to the

20  possible final conclusions.  So from the charging

21  office, where does it go?

22     A.  From the charging office, it comes back to my

23  office.  And I make the determination if I should hear

24  the case or if I should defer the case to the Director

25  of Public Safety.

1    Q.  And that is who?  Martin Flask?

2    A.  Martin Flask.

3    Q.  And what are the -- what's the criteria for you

4  making that kind of decision?

5    A.  Per city charter, I could only suspend up to ten

6  days, and I cannot terminate anyone.  That authority

7  comes under the Director of Public Safety, ten days and

8  beyond, and termination.

9    Q.  All right.  And if you keep the matter then

10  there's, I take it there's some kind of administrative

11  hearing?

12    A.  If I retain the matter in my office, there would

13  be a disciplinary hearing.

14    Q.  And that's where evidence and witnesses give

15  their point of view?

16    A.  Yes, sir.

17    Q.  And the officers have the right of representation

18  from the union or from the lawyer from the union, that

19  kind of thing?

20    A.  That's correct.

21    Q.  All right.  And then you make a decision

22  regarding whether to impose discipline or not?

23    A.  Correct.

24    Q.  And your decision is final, when you retain

25  jurisdiction?

1    A.  Yes, sir.

2    Q.  And then after that there could be a grievance

3  filed?

4    A.  Yes, sir.

5    Q.  And then it goes through the procedures that are

6  defined in the collective bargaining agreement, correct?

7    A.  Correct.

8    Q.  All right.  And -- I'm trying to get this so we

9  could speed this up.  I don't mean anything I'm asking

10  you as controversial.  But if the Safety Director takes

11  the jurisdiction, because of more punitive possible

12  sanctions, it's the same procedure, correct?

13    A.  Yes.

14    Q.  All right.  Now, in this case, did the matter get

15  to the charging officers?

16    A.  Yes.

17    Q.  Okay.  Were papers issued?

18    A.  I don't believe there were.

19    Q.  And why is that?

20    A.  There was a ruling by the law department.

21    Q.  And what was that ruling?

22        MR. MALLAMAD:  Let me just interrupt, Chief.

23  If you have knowledge of privileged communications

24  between yourself and the law department, do not discuss

25  that.  But if you are able to respond in a fashion that

1   would not reveal that, if any, you can respond to the

2   question.

3              THE WITNESS:  It would be private

4   communications.  MR. GILBERT:  Okay.  Well, that's

5   something we have to deal with later.

6              MR. MALLAMAD:  Right.

7              MR. GILBERT:  So I'm not going to -- you

8   noted it.  And obviously we object to it.

9      Q.  But I'm going to ask you something surrounding

10  that which won't be privileged, that I don't believe

11  would be privileged.

12       Did you get a phone call or did you meet with

13  somebody in person from the law department?

14      A.  My correspondence with the law department was

15  through the charging officer.

16      Q.  Who was the charging officer?

17      A.  Sergeant Brian Carney.

18      Q.  Brian, B-R-I-A-N?

19      A.  Correct.

20      Q.  C-A-R-N-E-Y?

21      A.  Correct.

22      Q.  Okay.  So you and he had a conversation?

23      A.  Yes, sir.

24      Q.  Okay.  He's not a lawyer, is he?

25      A.  No, sir.

Page 28

1     Q.  He's not acting as your counsel, correct?

2     A.  No, sir.

3     Q.  Tell me the conversation that you had with Brian

4  Carney?

5     A.  That the to proceed with charges we were told to

6  hold it per the law department.

7     Q.  Was there any follow-up discussion with anyone

8  regarding that communication?

9     A.  No.

10    Q.  Did you then -- did you know the person from the

11 law department -- was there a name of the person from

12 the law department who Brian Carney referred to?

13    A.  Sir, I don't recall.

14    Q.  Okay.  And did you talk to anybody from the law

15 department?

16    A.  I did.

17    Q.  Who did you talk to?

18    A.  I don't recall specifically who I spoke with at

19 the time.

20    Q.  Was it anybody in this room?

21    A.  No, sir.

22    Q.  Do you know if it was the law director?

23    A.  Sir, I don't recall.

24    Q.  And were there any -- was there anything written

25 that you are aware of, which memorializes this decision,

1    the decision to hold off the charging process?

2        A.  At the time I was not aware of anything that was

3    written.

4        Q.  Okay.  Now are you aware?

5        A.  Yes.

6        Q.  Okay.  What are you aware of that was written?

7        A.  I believe there was a document from Jon Dileno.

8        Q.  Okay.  What was that document?

9        A.  Sir, I just saw the document.

10       Q.  So it's the one I have?

11       A.  Yes, sir.  I just saw the document.

12       Q.  So we'll look at Exhibit 2, now that you mention

13   it.  And tell me if that's the document that you're

14   speaking of.

15       A.  This is the document yes, sir.

16       Q.  Okay.  Now, getting back to Exhibit 1, and just

17   please refer to the date at the top left-hand corner.

18   It's September 13, 2012, correct?

19       A.  Correct.

20       Q.  All right.  The incident happened around July 4,

21   2011, right?

22       A.  Correct.

23       Q.  Do you know, is it unusual to get -- to take

24   about 14 months to get the process of investigating

25   rules and violations surrounding a case like this, take

1    that long?

2        A.  This was an unusual case.  It was being

3    investigated by a different municipality.  Due to that

4    fact, we can only monitor the case.  We couldn't really

5    lead their investigation.  We couldn't do that until

6    they completed their criminal process.

7            Once that was completed, we did have access to

8    their investigative file at which time we could review

9    it, to determine if in fact officers violated any rules

10   or regulations of the division of police.

11       Q.  Now, the letter, Exhibit 2, I see it's a letter

12   from Jon Dileno, of Zashin & Rich Law Firm, to Pat

13   D'Angelo.  Is that what --

14       A.  Yes, sir.

15       Q.  And this letter, it speaks for itself.  But it

16   looks to me like Dileno represents the City of Cleveland

17   in this matter of the administrative proceedings,

18   correct?

19       A.  Correct.

20       Q.  And Pat D'Angelo is the attorney for the

21   Cleveland Police Patrol Association Union, that is

22   representing the officers here, correct?

23       A.  Correct.

24       Q.  Okay.  And this basically is the City of

25   Cleveland accepting the Cleveland Police Patrolman's

1   Association October 17, 2012 request, to hold the city's

2   decision whether to proceed with administrative

3   disciplinary charges against PO Craska and/or PO Mindek

4   and any related pre-disciplinary hearings and

5   arbitrations until after the conclusion of the

6   litigation caption, Bernadette Roland, his mother and

7   the executive of the estate of Daniel Ficker, et al

8   versus City of Cleveland, and it goes on with the case

9   number, that's your understanding?

10      A.  Yes, sir.

11      Q.  That there was an agreement with the City of

12  Cleveland and the union to hold any discipline that was

13  recommended against Craska and Mindek until the case

14  that we're on here today is finalized, is that your

15  understanding?

16      A.  Yes, sir.

17      Q.  Okay.  In the eight and a half years of being a

18  chief in the City of Cleveland, has something like this,

19  where discipline is held in abeyance for a civil case to

20  be completed ever occurred in your history of being a

21  police officer -- I mean chief, sorry.

22              MR. MALLAMAD:  Objection.  You can answer.

23              MR. GILBERT:  We can go beyond the chief.

24      Q.  In the eight and a half years, have you ever seen

25  anything like that happen?

1          MR. MALLAMAD:  Objection.  You can answer,

2     Chief.

3     A.  Yes.

4     Q.  In what case would that have been, if you recall?

5     A.  I don't recall, specifically.  But it was another

6     case out of a different municipality.

7     Q.  Is there a way you can find out what case that

8     was and tell Mr. Mallamad?

9     A.  Yes.

10    Q.  Okay.  Appreciate it, if you can do that.  I

11    would like to know which one it was.

12    A.  Yes, sir.

13    Q.  Now, in this letter it refers to an October 17th

14    request.  So October 17, 2012 request, do you see that?

15    By the union.

16    A.  Yes, I do.

17    Q.  Okay.  Did you ever see something in writing

18    regarding that request?

19    A.  I do not recall.

20    Q.  Okay.  Now, did you register an objection to this

21    delay of administrative disciplinary proceedings?

22    A.  I do not recall --

23          MR. KAISER:  Objection to who, because it

24    could be privileged.

25          MR. GILBERT:  Well, let's see if he

Page 33

1  remembers if he did or didn't.

2      A.  I don't recall, sir.

3      Q.  All right.  These were pretty serious allegations

4  made by the Integrity Control Section, regarding these

5  two officers, were they not?

6              MR. MALLAMAD:  Objection.  You can answer,

7  Chief.

8      A.  Yes, sir.

9      Q.  All right.  One of them was recommended to be

10  evaluated for termination because of alleged cowardly

11  acts in connection with this incident, correct?

12      A.  Yes, sir.

13              MS. ASSAD:  Objection.

14      Q.  Do you know whether -- that was Mindek, right?

15      A.  Yes, sir.

16      Q.  Is Mindek still on the police force?

17      A.  Yes, sir.

18      Q.  Is he carrying a gun?

19      A.  Yes, sir.

20      Q.  Is he -- does he have the -- does he still enjoy

21  all of the privileges and benefits of being a police

22  officer?

23      A.  Yes, sir.

24      Q.  Okay.  You realize that civil litigation can take

25  years sometimes, right?

1   A.  Yes, sir.

2   Q.  Okay.  What's the purpose of discipline for the

3  police officer?  What's the reason you want to

4  discipline the police officers who commit violations,

5  particularly serious violations?

6           MR. KAISER:  Administrative violations?

7           MR. GILBERT:  Yes.

8   A.  The purpose is to correct their actions.

9   Q.  All right.  And nothing has been done to correct

10 either Mindek or Craska's action on that particular day

11 at this point, as we sit here now, correct?

12          MR. MALLAMAD:  Objection.  You can answer,

13 Chief.

14  A.  Relative to administrative charges, we have not

15 proceeded yet, that is correct.

16  Q.  All right.  And your understanding, from the

17 agreement with the city, that the city participated in

18 with the union, is that it could be years before any

19 corrective action is taken regarding these two

20 particular officers, right?

21          MR. MALLAMAD:  Objection.  You can answer,

22 Chief.

23  A.  Right.

24  Q.  Do you believe that's a good thing?

25          MR. MALLAMAD:  Objection.  You can answer,

1  Chief.

2         MR. KAISER:  Objection.

3     A.  It would depend on the circumstances.

4     Q.  Doesn't that fly in the face of corrective

5  discipline, this delay that can go on for years?

6         MR. KAISER:  Objection.

7         MR. MALLAMAD:  Objection.  You can answer,

8  Chief.

9     A.  That's a very difficult question to respond to,

10  the delay in these administrative charges.  When there

11  is delays we do take other precautions to ensure that

12  we're not placing the officers in the same situations.

13     Q.  Do you know what corrective measures, if any,

14  were taken, with respect to Craska or Mindek?

15         MR. MALLAMAD:  Objection.  You can answer,

16  Chief.

17     A.  When officers are involved in a deadly force

18  incident, there's a process of protocol they have to go

19  through to get cleared through the medical unit.  Once

20  they clear the medical unit, we put them through

21  transitional duty assignments, normally where they do

22  not have any contact with the public.

23     Q.  Now, you gave me a general answer.  The question

24  was, do you know what corrective measures were taken

25  specifically with Mindek and/or Craska?

1          MR. MALLAMAD:  Objection.  You may answer,

2     Chief.

3     A.  Once they were cleared through the Employees

4     Assistance Unit, our early intervention program, they

5     were assigned to areas where they would not have public

6     contact.

7     Q.  All right.  But that's -- from my understanding,

8     that's an automatic kind of process for any kind of

9     deadly force shootings, correct?  There's a period of

10    time where that happens?

11    A.  That's not correct.  There are some officers that

12    once they clear the early interventions program we put

13    them back to their regular duty assignments.  There are

14    other officers that request themselves to go to

15    transitional duties because they don't feel comfortable

16    going back to their regular duty assignments.  And then

17    there's those officers that we just place in these

18    nonsensitive positions so they don't have public

19    contact, until we can resolve the administrative

20    process.

21    Q.  All right.  With Mindek and Craska, do you know

22    where they are assigned right now?

23    A.  I believe that Officer Mindek is assigned to

24    administrative duties and the district he's assigned to,

25    I believe, is Five.  Officer Craska is on the sick list,

Page 37

1    and has been for quite a long time.

2        Q.  Okay.  So he's not even working right now?

3        A.  No, sir.  He's not working.

4        Q.  When we had a deposition of him a couple months

5    ago I thought he was assigned -- he said he was assigned

6    to the airport.

7        A.  Once he cleared the Employee's Assistance Unit,

8    the early intervention program, he was detailed to an

9    administrative job for quite a long time.  So we tried

10   to transition Officer Craska back.  And we did assign

11   him to the airport.  But I don't believe he ever

12   reported to the airport.  He's been on the sick list for

13   an extended period of time.

14       Q.  Okay.  Both officers are being paid, I assume,

15   their regular payments?

16       A.  Officer Mindek should be receiving his paycheck.

17   I can't be specific with if officer Craska, because it's

18   close, but I think he may be ironclad now, where he is

19   off sick but he does not have any more sick time, so

20   he's not being paid.

21       Q.  All right.  Are these officers able to work in

22   secondary employment as police officers for security or

23   that kind of thing?

24       A.  Officer Mindek can.  Officer Craska cannot.

25       Q.  All right.  And that's because Craska is on sick

1   leave, right?

2      A.  Yes, sir.

3      Q.  All right.  So Mindek can qualify for secondary

4   employment where he would be in a uniform and have his

5   full array of weaponry and equipment and have the powers

6   of the police officer, with respect to engaging the

7   public, correct?

8      A.  Correct.  But he first has to submit a request

9   through my office.  It has to be approved by the safety

10  director.

11     Q.  All right.  Which is the procedure for anybody

12  who is seeking outside secondary employment, right?

13     A.  Correct.

14     Q.  I want to ask you a few questions in Exhibit 1.

15  In this document, there are three officers who are being

16  reviewed for their role in activity, in connection with

17  the incident of July 4th -- July 3rd, July 4, 2011,

18  correct?

19     A.  Yes, sir.

20     Q.  That would be Patrol Officer Craska, Patrol

21  Officer Mindek, and Sergeant Daley, right?

22     A.  Correct.

23     Q.  Okay.  For Patrol Officer Craska the conclusion

24  was that he was justified in the use of deadly force,

25  correct?

1     A.   Correct.

2     Q.   Okay.  And there's these bullet points.  Now,

3  with respect to the second one there, when Craska, when

4  requesting permission to leave the city for

5  investigation neglected to provide all the details to

6  Sergeant Daley.  All right.

7          With respect to that particular issue, what is it

8  that you understand to be a violation of Cleveland

9  Police policies and procedures?

10    A.   This particular document that I'm reviewing now,

11  this is a summation of the Internal Affairs sergeant's

12  investigation.  And there were several rule violations

13  that were identified by Sergeant Montalvo.

14    Q.   All right.  Well, my question is -- let me ask

15  you this in a general sense.  When an officer gets --

16  tries to get approval to go to another city, what is

17  your understanding of what should be done in those

18  situations under Cleveland Police policies and

19  procedures?

20             MR. MALLAMAD:  Objection.  You may answer,

21  Chief.

22    A.   Let me begin by stating, there is no specific, at

23  this time, policy and procedure.  But what should be

24  done is they should provide the information to the

25  supervisor that is going to grant them permission to

1   leave the city, as to what the circumstances are.

2       Q.  Why is that important?

3       A.  So that the supervisor can make a decision, a

4   good decision, as to permitting the officer to leave the

5   city or not.

6       Q.  Is there -- what policing considerations go into

7   that kind of decision?  What are the categories of

8   policing, good policing, philosophies that go into such

9   a decision?

10      A.  That's a very general, difficult question to

11  answer.  But if the officer is going to leave the city,

12  they provide the supervisor with the necessary

13  information for him to grant them the permission.

14      Q.  Isn't it important to know the nature of the

15  call, the reason for going to the city and what is the

16  expected activity that the officer is going to be

17  involved in?

18      A.  The officer would be expected to provide that

19  supervisor with the necessary information.  And it could

20  be the nature of the report he needs to follow up on, or

21  whatever other issues he has to deal with, so that

22  supervisor, in granting permission, will have an

23  understanding of why he's leaving the city.

24      Q.  And not telling the supervisor that the officer

25  is bringing along an off-duty officer, who supposedly is

Page 41

1    the victim, is going to a person of interests home in

2    another jurisdiction, that would be important

3    information, would it not?

4        A.  Yes, sir.

5                 MR. BACEVICE:  Objection.

6        Q.  Okay.  The supervisors would want to know what

7    they may be getting themselves into, correct?

8        A.  Correct.

9        Q.  Let's go down further.  The next one is PO Craska

10   was assigned to a one man CSU car.  And as such

11   structure in their assigned duties, they are assigned

12   mainly quality of life issues.

13              My question to you is, first of all, what is the

14   difference between the duties of a CSU officer and a

15   regular patrol officer assigned to a District?

16       A.  I believe you're asking the difference between a

17   CSU officer and the officers assigned to the regular

18   zone cars.

19       Q.  Yes.

20       A.  And the primary difference is the fact that these

21   officers assigned to the Community Services Unit are not

22   directly responsive to police radio, for radio calls of

23   service.  That's the primary difference.

24       Q.  All right.  Why is that the case?

25       A.  The community service officers serve numerous

1  functions for the district commanders.  But their

2  primary function is to be responsive to the quality of

3  life issues that are identified by the community where

4  they work.  For example, barking dog, loud music all the

5  time, abandoned cars, drug boys standing on the corner,

6  basketball hoop in the street.  These are issues that

7  happen every day.  So the community services officers,

8  one of their responsibilities is to, when these

9  complaints go into their office, is go out there and

10  work with the neighbors and the complaints, to resolve

11  the issues.

12     Q.  All right.  So the Community Service Unit deals

13  with that community that they are assigned to, correct?

14     A.  They have several responsibilities.  That's their

15  primary responsibility.  And then they're -- they work

16  for the discretion of the district commander.

17        If the district commander sees fit one day to

18  place them on an auto theft detail or burglary detail,

19  they can do that.  Some days they supplement the zone

20  cars because we may have had a lot of people call in

21  sick, maybe people on vacation or training.  So there

22  are those days that we take community service officers

23  and have them assist with radio runs.

24        So their responsibilities are quite large.  But

25  they work at the discretion of the district commander to

1  serve the community in that respective district.

2      Q.  Do you -- on that bullet point there, how does

3  that fit into the disciplinary recommendation?  What

4  does it mean there?  Is this suggesting that his actions

5  that night are under scrutiny because he was in the CSU

6  Unit and not in a zone car?

7              MR. MALLAMAD:  Objection.  You can answer,

8  Chief.

9              MR. GILBERT:  I'm trying to get

10 clarification.  How that fits in the recommendation of

11 discipline.

12     A.  Right.  And that's bullet point three?

13     Q.  Yes.

14     A.  On this document?

15     Q.  Yes.

16     A.  That was the opinion of Captain Cumba.  And I

17 really can't answer for Captain Cumba --

18     Q.  Okay.

19     A.  -- why he wrote it that way.  Because it's not

20 really -- it's not real clear as what he was trying to

21 say there.  So you would probably have to ask him.

22     Q.  All right.  But if the idea of leaving the

23 jurisdiction to go to another city is being discussed,

24 it would be more likely that that would happen with a

25 zone officer versus a CSU officer?

1    A.  No.  I mean, there's been times when CSU officers

2    would leave the city to follow up on certain incidents.

3    Q.  All right.

4    A.  And there's times when zone car officers would

5    leave the city.  But the CSU officers have more latitude

6    in their time, because they are not directly responsive

7    to radio runs.  So if they have time in the workload,

8    according to the district commander of that particular

9    evening, they have open time.  They would have the time

10   to request the follow-up on the investigation that they

11   were conducting.  Where zone cars, because they are

12   directly responsive to radio, they don't have the time

13   in certain situations to leave the cities, because they

14   have radio runs coming through.  And they have to be

15   responsive to them.  Because that's their primary

16   responsibility, the calls coming from police radio, the

17   communication controls section.

18   Q.  All right.  Let's go down further.  The next one

19   where it says, PO Craska's duties did not include

20   investigating these type of incidents.

21        What can you -- can you elaborate on that?  Or do

22   you understand what that means?

23   A.  No, sir.  I cannot elaborate on that.

24   Q.  Okay.  Now, there were various things -- and if

25   you want to look at 24, maybe that's a better place of

1   the investigation, because it's more specific with

2   Craska.  If you look at the first three on page 24, one,

3   two, and three, that deals with failing the -- actually

4   two and three deals with the fair form Daley -- the

5   specific details regarding the assignment, correct?

6       A.  Correct.

7       Q.  And we've gone over that?

8       A.  Yes, sir.

9           MR. MALLAMAD:  And just for the record, the

10  chief is looking at Exhibit B, from Lieutenant Cutlip's

11  deposition, taken on September 13, 2013.

12          MR. GILBERT:  Thank you, Shawn.  I

13  appreciate that.

14      Q.  Number three is similar, in that it says that

15  officer Craska failed to inform sergeant Daley that a

16  CPD officer was the complainant of the theft report.

17  That, apparently, correct me if I'm wrong, he didn't

18  inform that an off-duty officer, Mindek, was going along

19  with him to Parma.  And that that off-duty officer was a

20  complainant regarding the theft report.  Is that your

21  understanding?

22      A.  Yes, sir.

23      Q.  Okay.  And that's a -- was considered to be a

24  violation, do you agree with that?

25      A.  Yes, sir.

1      Q.   Number four, it says that Craska initiated this

2   assignment, which gave the appearance of impropriety

3   when he acted on a personal call from Officer Mindek,

4   who was off duty and did not inform a supervisor.  Do

5   you agree with that?

6      A.   Yes.

7      Q.   Why is, in your experience and given your role as

8   a chief, is the appearance of impropriety a problem when

9   engaging in police work?

10     A.   Again, that's a very broad question.

11     Q.   Okay.  Well, let's relate it to this incident.

12     A.   Even in this incident, it is a very broad

13   question.  But officers are to deal with the facts.  And

14   you can't show favoritism any place.  You deal with the

15   facts.  You go to a home, there's a suspected theft, you

16   follow up on it, period.

17          Does the fact the assignment was received from

18   another officer, it does, according to this particular

19   document, give that impression that there may be an

20   issue here, as far as --

21     Q.   And we -- okay.  Are you done?  I'm sorry.

22     A.   Yes, sir.

23     Q.   Okay.  And in this particular situation, Mindek

24   and Craska went to Parma, to the home of the, for lack

25   of a better term, suspect of the theft at Mindek's

1    residence during a party earlier that day.  Where the

2    wife of officer Mindek suspected Dan Ficker as stealing

3    some items in a bedroom, right?

4                    MR. MALLAMAD:  Objection.  You can answer,

5    Chief.

6        Q.  Is that what you understood to be the situation?

7        A.  What I understood to be the situation was that

8    they went to the wife's cousin's house to follow up on a

9    theft from a party, which took place in Cleveland.

10       Q.  Okay.  Well, I think that's true.  But they were

11   going to Parma to engage the suspect concerning this

12   alleged theft from a house in Cleveland, where Mindek

13   lives with his wife, and Mr. Ficker and his girlfriend

14   were in earlier in the day, correct?

15       A.  Could you repeat that question, please?

16                   MR. GILBERT:  You're going to have to read

17   it back.

18                        -  -  -  -

19           (Thereupon, the requested portion of

20           the record was read by the Notary.)

21                        -  -  -  -

22                   MR. MALLAMAD:  Okay.  I'm going to interpose

23   an objection.  You may answer, Chief.

24                   MR. KAISER:  I'll join.

25       A.  They were going to the house to investigate a

1    theft, to obtain additional information to complete

2    their report.

3        Q.  Okay.

4        A.  Craska was going there to get additional

5    information to complete his report.

6        Q.  And that was found also to be a problem in this

7    investigation, that he was doing -- that he needed to

8    get information for the report by going to Parma?  Do

9    you understand the question?

10             MR. MALLAMAD:  Objection.  You may answer,

11   Chief.

12       A.  I do understand the question.  But from when I

13   reviewed the file, I believe Officer Craska was going to

14   confirm the last name of possibly a suspect, relative to

15   a theft offense from Cleveland.

16       Q.  Okay.  If you look at number seven, it says

17   Officer Craska did not have evidence to make Dan Ficker

18   a named suspect in a report, do you see that?

19       A.  Correct.

20       Q.  Can you explain to me how that is relevant in

21   this?

22             MR. MALLAMAD:  Objection.  You may answer,

23   Chief.

24       A.  My understanding is that at the scene of the

25   incident he received the information that possibly

1   Mr. Ficker was a suspect.  But they did not have the

2   correct last name.  And he was going to the cousin's --

3   his wife's cousin's house to obtain that information and

4   confirmed the last name of Mr. Ficker.

5       Q.  Getting back to the issue of the appearance of

6   impropriety, is there a potential danger when you take a

7   victim, who is a police officer, to have personal

8   contact with the suspect, when there is a family kind of

9   relationship going on there, at least to the extent of

10  the girlfriend of the suspect?

11             MS ASSAD:  Objection.  Misleading.

12             MR. KAISER:  Objection.

13             MR. MALLAMAD:  Objection.  You may answer,

14  Chief.

15      A.  Protocol should be that you do not take the

16  complainant with you when you do the follow-up

17  investigation, relative to a theft offense or any

18  criminal investigation.

19      Q.  Okay.  Also, did the fact that he was, Craska was

20  assigned to a one -- SR one-man car, have any relevance

21  in this investigation, if you know?

22      A.  MR. MALLAMAD:  Objection.

23      Q.  I'm looking at the bullet point back on number

24  one.  The fifth one down.  Violated SR protocol for

25  one-man car.

1            MR. MALLAMAD:  I have an objection.  You may

2   answer, Chief.

3      A.  That is -- that particular bullet point that you

4   pointed out was one of the issues that we would deal

5   with during an administrative hearing.  We have to look

6   at the totality of the circumstances at the time.  And

7   to do a follow-up on a theft report just to obtain

8   confirmation on a last name could fall within the

9   responsibilities of an SR car, depending on the

10  situation.

11     Q.  All right.  But this was noted to be one of the

12  violations in this case.

13     A.  And it's --

14            MS. ASSAD:  Objection.

15     A.  And it's definitely one of the issues we would

16  have dealt with during the administrative hearings.

17     Q.  But you signed off on this investigation and

18  agreeing that the citation of violation against Craska,

19  for violating the rules of the SR protocol was an

20  appropriate measure for disciplinary action, correct?

21            MR. MALLAMAD:  Objection.  You may answer,

22  Chief.

23     A.  That was one of the specifications we would look

24  at, as far as administrative charging perceived, yes.

25     Q.  The charges were never actually drafted, were

1    they?

2        A.   I don't know, sir.

3            MR. KAISER:  Terry, would you mind either

4    taking a short break, or let Jack handle objections for

5    officer Craska?

6            MR. GILBERT:  We'll let Jack do it.

7            MR. MALLAMAD:  Do you need to take a break?

8            MR. GILBERT:  I'm almost done.

9            MR. BACEVICE:  How tight?  Should I call

10   Daley?  You want to take a break, and I'll just call

11   Daley?

12           MR. GILBERT:  Sure.

13           (Off the record.)

14   BY MR. GILBERT:

15       Q.   I got a few more questions and you will be done.

16   Were you aware that there was a recommendation in the

17   context of the Internal Affairs to review policies

18   regarding the circumstances of leaving a jurisdiction

19   and going to another jurisdiction?

20           MR. MALLAMAD:  Objection.  You may answer,

21   Chief.

22       A.   You know, I do not recall the report reading

23   that.

24       Q.   Okay.  I don't have it with me, but I think it

25   was Lieutenant Cutlip who said that it might be a good

Page 52

1   idea to look at that situation, and see if written

2   policies would be appropriate regarding -- okay.  I'm

3   sorry.  I'm reading from Lieutenant Cutlip's -- he also

4   prepared a report.

5        A.  Correct.

6        Q.  Where he said, In addition --

7                  MR. FRIEDMAN:  Do you want to mark it?

8                  MR. MALLAMAD:  I have it right here.  It's

9   Exhibit A from Lieutenant Cutlip's deposition on

10  September 13th.  I'm giving the chief a copy of that.

11       Q.  The last paragraph on the, I think it's the third

12  page.  He requested that divisional policies be reviewed

13  and updated in regards to division personnel leaving the

14  city and conducting police matters?

15       A.  Yes, sir.

16       Q.  Do you know if any action has been taken on that

17  recommendation?

18                  MR. MALLAMAD:  Objection.  You may answer,

19  Chief.

20       A.  Yes, sir.

21       Q.  There has been?

22       A.  Yes, sir.

23       Q.  Okay.  Tell me about that.

24                  MR. MALLAMAD:  It's okay to show a continued

25  objection --

1          MR. GILBERT:  That's fine.

2          MR. MALLAMAD:  -- to any remedial measures

3    --

4          MR. GILBERT:  Noted.

5          MR. MALLAMAD:  -- under the Rules of

6    Evidence.

7     A.  I issued a departmental notice.  Being a little

8    more specific, relative to officers leaving the city.

9     Q.  And what is the departmental notice?

10    A.  Departmental notice is direction provided by my

11    office to give direction to officers and supervisors

12    within the ranks.

13    Q.  Okay.  And so does that have the same purpose as

14    a policy or general order, in terms of what you expect

15    officers to follow?

16    A.  Yes, sir.

17    Q.  Okay.  And so it's called a notice?  Is there a

18    name?  Is there a title or anything like that?

19    A.  It's called the Departmental Divisional Notice.

20    Q.  Is there a -- further, is there a notice in that

21    notice?  Is there like a heading or a topic?

22    A.  Yes, sir.

23    Q.  Do you remember what it would be?

24    A.  Not specifically, no.

25    Q.  What does it deal with?

1      A.   That particular notice was dealing with

2  responsibilities of supervisors and officers leaving the

3  City of Cleveland.

4      Q.  All right.  And do you remember when that was

5  issued?

6      A.  No, sir.  I don't.

7      Q.  Would it have been after the suggestion by

8  Lieutenant Cutlip and the conclusion of the Internal

9  Affairs investigation?

10     A.  I do not recall.

11     Q.  We can get a copy of that, right?

12     A.  Yes, sir.

13     Q.  And in your own -- from your own recollection,

14 what are the new protocols, regarding leaving the

15 jurisdiction on police business?

16     A.  That supervisors accompanying the officers.

17     Q.  So this actually goes beyond just getting the

18 approval from the supervisor.  It actually requires the

19 supervisor to accompany that officer?

20     A.  Yes, sir.  I believe so.

21     Q.  Okay.

22     A.  It's been a while since I issued it.  So I would

23 have to reread it to be more specific.  But that was one

24 of the issues I was dealing with.

25     Q.  Okay.  And I take it that the agreement between

1    the city and the union to delay administrative

2    disciplinary measures against these two officers did not

3    affect your right or authority to review policies and

4    procedures and act accordingly, correct?

5                    MR. MALLAMAD:  Objection.  You may answer,

6    Chief.

7       A.  Correct.

8       Q.  Okay.

9                    MR. GILBERT:  I thank you.  I have no

10   further questions.

11                   MR. MALLAMAD:  Chief McGrath would like to

12   review his testimony.  Thanks.

13                   (Off the record.)

14                            - - -

15

16

17

18

19

20

21

22

23

24

25

Page 56

1

2

3                     C E R T I F I C A T E

4

5          I, Denise L. Kautzman, a Notary Public within and

6    for the State of Ohio, do hereby certify that I attended

7    the foregoing hearing in its entirety, that I wrote the

8    same in stenotypy, and that this is a true and correct

9    transcript of my stenotype notes.

10             IN WITNESS WHEREOF, I have hereunto set my hand

11   and seal of office, at Cleveland, Ohio, this _____ day

12   of _____ A.D. 20____.

13

14

15

16

17   _____
     Denise L. Kautzman, Notary Public, State of Ohio
18   1021 Ohio Savings Plaza, 1801 East 9th Street,
     Cleveland, Ohio 44114
19   My commission expires November 29, 2016.

20

21

22

23

24

25