UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BERNADETTE ROLEN, Administratrix | ) | Case No.: 1:12 CV 1914 |
| of the Estate of Daniel Ficker, *et al.,* | ) | |
| | ) | |
| Plaintiffs | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, *et al.,* | ) | |
| | ) | |
| Defendants | ) | ORDER |

Currently pending before the court are Defendant Matthew Craska's Motion for Summary

Judgment (ECF No. 39) ("Craska's Motion"), Defendant David Mindek's Motion for Summary

Judgment (ECF No. 40) ("Mindek's Motion"), Defendant City of Cleveland's Motion for Summary

Judgment (ECF No. 41) ("City's Motion"), and Plaintiffs' Motion to Strike Defendant Craska's and

Mindek's Exhibit I (ECF No. 44) ("Plaintiffs' Motion"). For the foregoing reasons, the court denies

Craska's Motion, Mindek's Motion, and the City's Motion, and denies as moot Plaintiffs' Motion.

Bernadette Rolen ("Rolen"), in her capacity as Administratrix of the Estate of Daniel Ficker

("Ficker"), and Tiffany Urbach ("Urbach"), Ficker's girlfriend (together, "Plaintiffs") brought the

above-captioned action against Defendants Officer Matthew Craska ("Craska"), Officer David

Mindek ("Mindek") (collectively, "Officers"), and the City of Cleveland (the "City"), (collectively,

"Defendants"), seeking compensatory and punitive damages, equitable relief and attorney's fees.

In their Complaint, Plaintiffs allege the following causes of action: (1) a civil rights claim under 42

U.S.C. § 1983 that Defendants deprived Ficker of his constitutional rights under the Fourth and Fourteenth Amendment of the United States Constitution; (2) a governmental liability claim against the City of Cleveland for failure to train, monitor and supervise its officers, and failure to implement adequate policies to instruct its officers on constitutional limitations; (3) state law claim for willful, wanton, and reckless conduct; (4) state law claim for assault and battery; (5) state law claim for false arrest; (6) state law claim on behalf of Urbach for intentional infliction of emotional distress; (7) a state law claim for wrongful death under Ohio Revised Code §§ 2125.01–2125.03; and (8) survivorship action. (Compl. at ¶¶ 30-67, ECF No. 1-1.) Previously, the court granted the City's Motion to Dismiss (ECF No. 6) in part, issuing an order dismissing all state law claims against the City but not the § 1983 governmental liability claim. (*See* ECF No. 29.)

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff Rolen is the mother and administratrix of Ficker's estate, and resides in the City of Olmsted Falls, Cuyahoga County, Ohio. (Compl. at ¶ 3.) Plaintiff Urbach[1] was Ficker's girlfriend until his death, and the mother of their two children. (*Id.* at ¶ 4.) Urbach resides in the City of Parma, also in Cuyahoga County, Ohio. (*Id.*) Defendants Craska and Mindek are police officers for the City of Cleveland, Ohio. (*Id.* at ¶¶ 5-6.) Defendant City of Cleveland is a municipal corporation located in Ohio. (*Id.* at ¶ 7.)

### A. Missing Property from Mindek Residence

On July 3, 2011, Ficker and Urbach and their two minor children attended a Fourth of July party at Kimberly Mindek's house in Cleveland, Ohio. (Dep. of Tiffany Urbach at 27:2-30:1,

---

[1]     Urbach brings this action with respect to Count Six only ("Infliction of Emotional Distress" under Ohio law).

Craska's Mot. Summ. J. Ex. D, ECF No. 39-4.) Kimberly Mindek ("Mrs. Mindek") is David

Mindek's wife, as well as Urbach's cousin. (*Id.* at 30:9-14.) According to Urbach, during the party,

guests were primarily outdoors and only used the downstairs bathroom. (*Id.* at 30:21-31:4, 33:14-

34:20.) Ficker, Urbach, and their children left the party in the late afternoon, and proceeded to go

to Urbach's parents' house in Strongsville, Ohio, where they remained for several hours. (*Id.* at

36:25-40:21.) In the evening, Urbach and Ficker left their children at her parents' house, and went

to a local bar for an hour or so. (*Id.* at 40:22-43:18, 46:22-24.)

At sometime between 10:00 and 10:30 p.m., Mrs. Mindek called Defendant Mindek and told

him that she had realized that her wallet and debit card were missing. (Dep. of David Mindek at

25:2-10, Craska's Mot. Summ. J. Ex. B, ECF No. 39-2.) Fifteen minutes later, Mrs. Mindek called

Defendant Mindek again and told him that she had discovered more missing property from their

upstairs bedroom, including her wedding ring and some other jewelry. (*Id.* at 26:17-27:20).

Defendant Mindek left work early and headed home to discuss the theft with his wife. (*Id.* at 30:23-

25.) On the way home, around 11:00 p.m., Defendant Mindek called Craska on his personal cell

phone to tell him about the robbery and request his assistance. (*Id.* at 31:9-32:14.) Mrs. Mindek had

told Defendant Mindek that she suspected Ficker of stealing the property because she had seen him

coming from upstairs during the party. (*Id.* at 32:8-14, 33:16-18.)

### B. Defendants Craska and Mindek Investigate the Theft

Mindek's house was located in the second district, where Craska was on duty. (Craska Dep.

at 52:24-53:3.) According to Craska, he drove to the Mindek residence and called into dispatch to

inform them of his location and request a number for use in his official report. (*Id.* at 54:2-5.) Mrs.

Mindek told Craska that there had been a party and the guests were told that the upstairs was off

limits. (*Id.* at 62:16-20.) Mrs. Mindek told Craska that Ficker, whom she referred to as her cousin's "on again/off again boyfriend," was seen coming from upstairs, where the property was later discovered missing. (*Id.* at 62:21-63:15.) According to Mrs. Mindek's account to Craska, Ficker acted nervous and guilty when he realized that she had seen him come from upstairs. (*Id.* at 63:15-64:8.) Mrs. Mindek did admit, however, that "she was obviously elsewhere during the party and there may well . . . have been other people that went upstairs that she didn't see." (*Id.* at 68:16-19.)

According to Craska, Defendant Mindek arrived home after Craska's arrival. (*Id.* at 70:4-6.) Defendant Mindek told Craska that Ficker had a prior weapons conviction. (*Id.* at 70:1-4.) Due to a miscommunication, Craska thought that Ficker's name was Daniel Vicker and asked dispatch to run the name Daniel Vicker, which yielded no results. (*Id.* at 69:19-22.) Craska asked the Mindeks to inventory the missing property amount in order to determine a dollar amount and assess the level of the crime. From the information provided, Craska determined that the crime should be reported as a felony. (*Id.* at 237:20-22.) Defendants never called detectives or anyone else in the Cleveland Police Department to come to the Mindek residence to dust for fingerprints or investigate the scene. (*Id.* at 75:4-15, 76:23-77:5.) Defendants, instead, decided to go to Urbach's residence to investigate the crime on their own.

According to Craska, he decided to go to Urbach's home at that late hour because he wanted to get Ficker's account of the events, and because the stolen goods were easy to dispose of, time was of the essence. (*Id.* at 94:11-95:2.) Craska decided to take Mindek with him because he could identify Ficker, identify the missing property, and serve as backup. (*Id.* at 80:10-20.) At approximately 11:37 p.m., Craska called Cleveland Police Department's dispatch and requested permission from a "patrol boss" to leave his jurisdiction to go to Parma. (*Id.* at 85:3-87:4; Dep. of

4

Sergeant Randolph Daley at 19:6-19, Craska's Mot. Ex. C, ECF No. 39-3.) Craska did not provide any details to the patrol boss, Sergeant Randolph Daley, about why he was going to Parma or that he was taking Mindek, the victim of the crime he was investigating. (Daley Dep. at 23:17-26:18; Craska Dep. at 91:4-93:12.) Defendant began driving to Urbach's home shortly therafter. While en route, Craska received a phone call from Officer Francis McManaman, of the Cleveland Police Department, asking if Craska needed another officer to ride with him. (Craska Dep. at 87:12-13.) Craska told McManaman that he was going to get a statement from a potential witness, that he had an off-duty officer with him, and that the off-duty officer was the victim. (*Id.* at 87:12-88:21.)

### C. Confrontation at Urbach's House

Ficker and Urbach were not home yet when Defendants arrived at Urbach's house. (*Id.* at 104:10-17.) However, Ficker and Urbach arrived shortly thereafter. (*Id.*) The parties give differing accounts as to the events that occurred once Urbach and Ficker arrived.

#### 1. Urbach's Account of the Events

According to Urbach, when she and Ficker returned home, Mindek was standing by the tree lawn next to the driveway and Craska was standing by his squad car parked in front of the house. (Urbach Dep. at 51:13-52:13.) Ficker only saw Mindek at that point and didn't know who he was until Urbach told him. (*Id.* at 52:14-23.) Urbach was driving and parked in the driveway. (*Id.* at 53:12-54:8.) Mindek was standing towards the back passenger side of the car. (*Id.* at 53:19-54:4.) Urbach and Ficker got out of their respective doors of the vehicle and met towards the back of the car. (*Id.* at 64:21-65:4.) Urbach told Mindek to leave, saying "No, we didn't do anything, now get off my property." (*Id.* at 65:19-66:2.)

Urbach and Ficker began walking up the sidewalk to the door of her house. (*Id.* 66:10-11.)

According to Urbach, she had just reached the steps to the house door when she felt a jerk. (*Id.* at 69:9-10.) She turned around and saw Craska pulling Ficker to the squad car. (*Id.* at 69:10-21.) Craska had Ficker over the trunk of the car. (*Id.* at 70:22-25.) Ficker repeatedly yelled, "Help me, come look," and yelled for their neighbor, Dawne, by name. (*Id.* at 71:2-10.) Urbach went back to Mindek, who was still standing by Urbach's car, and "[t]old him to tell his buddy to stop." (*Id.* at 70:10-21.) Mindek responded, "Give me your keys to search your car." (*Id.* at 72:4-8.) In response, Urbach "threw [her] keys at [Mindek] and told him to search it, he wouldn't find anything." (*Id.* at 70:12-15.) Urbach began pacing and called the Parma Heights Police Department "to ask them if [it] was okay for Cleveland Police officers to be questioning somebody in Parma." (*Id.* at 73:14-18.)

By Urbach's own admission, she did not see, or does not remember, most of the subsequent altercation because she was on the phone, pacing back and forth in front of the steps to her house door, trying to reach someone with the Parma Heights Police. (*Id.* at 77:10-79:19, 81:17-84:7.) During that time, she heard a gun shot, turned around, and saw Ficker laying on the walkway to the house door. (*Id.* at 84:10-23.) The last position Urbach saw Ficker in prior to the gun shot was chest down on the trunk of Craska's squad car. (*Id.* at 85:9-11.)

## 2. Defendants' Account of the Events

Defendants Craska and Mindek relay a different series of events than Urbach. Both Defendants concede that they did not have probable cause to detain Ficker by force when they arrived at Urbach's home. (Craska Dep. at 100:6-16; Mindek Dep. at 49:19-24.) According to Defendants, they approached Urbach's car as it entered the driveway. Craska approached Ficker as he was getting out of the car and said "Daniel? Come on over here. I want to ask you a couple

questions real quick." (*Id.* at107:25-108:2.) Ficker responded, "No." (*Id.* at 108:3-6.) Despite Ficker's refusal to speak with Craska, Craska told Ficker to come to the squad car because he needed to pat him down. (*Id.* at 108:15-109:7.) According to Defendants, Ficker was uncooperative so Craska and Mindek grabbed Ficker by the arm to get him into the squad car. (*Id.* at 116:7-16; Mindek Dep. at 64:25-65:18.) Craska admits that "there is no duty on the part of a civilian to cooperate with a police officer." (Craska Dep. at 114:12-20.)

According to Defendants, during the pat-down, Ficker repeatedly "took his hands off the car, [and] tried to turn around." (Craska Dep. at 121:4-6.) In response, Craska "grabbed [Ficker's] hands and . . . placed [them] back on" the trunk of the squad car. (*Id.* at 121:7-9.) Craska admits to possibly shoving Ficker during his efforts to keep him on the trunk. (*Id.* at 123:3-5.) During the pat-down, Craska discovered a small pocket knife, which Craska removed. (*Id.* at 123:10-11.) Ficker continued to scream to the neighbors throughout the pat-down. (*Id.* at 123:11-14.) He exclaimed that Defendants were "going to try to arrest [him]." (*Id.*) Craska told Ficker that he was not under arrest. (*Id.* at 123:14-15.) During the pat-down, Craska says he heard Urbach yell to Dave: "Here's the keys. We don't have your stuff. Search the house. Search the car." (*Id.* at 123:15-18.)

Because Ficker was intoxicated, Craska says that he felt that he needed to secure Ficker before conducting the search. (*Id.* at 123:18-22.) Craska told Ficker that he was going to place him in the squad car for a second, and tried to walk Ficker to the back seat. (*Id.* at 130:20-24.) Ficker repeatedly refused and made it clear that he did not want to be put in the squad car. (*Id.* at 131:9-21.) Craska proceeded to force Ficker into the car despite saying Ficker was not under arrest. (*Id.*) Ficker used his arms to brace himself. (*Id.* at -122:6.) Craska leaned into Ficker with his hip to nudge him. (*Id.* at 139:2-4.) According to Craska, Ficker "came off the car with his right elbow, spun around

and struck [Craska] in the breast bone with an elbow." (*Id.* at 139:5-8.) Craska says he felt the blow but that it was not disabling. (*Id.* at 140:5-6.) In response, Craska punched Ficker in the nose and put him in an arm bar. (*Id.* at 140:20-22.)

After punching Ficker in the face, Craska wrestled him to the tree lawn and told him he was under arrest for assault of a police officer. (*Id.* 142:11-143:6.) According to Craska, Ficker kept trying to push himself up off the ground. (*Id.* at 143:20-22.) Craska knocked Ficker's hand out and knees down to keep him on the ground. (*Id.* at 143:23-25.) After about a minute or so, Ficker was able to stand up and pull away from Craska. (*Id.* at 143:25-144:5.)

Once on his feet, Ficker punched a kneeling Craska while backing up into the yard. (*Id.* at 145:13-146:11.) Craska pulled out his taser and told Ficker to calm down or he would be tased. (*Id.* at 150:7-10.) Ficker refused, and according to Craska, insisted that Craska fight him. (*Id.* at 150:10-19.) Craska deployed his taser but it was not effective. (*Id.* at 154:3-11.) Instead of putting another cartridge in the taser and trying again, Craska threw the taser toward the next yard. (*Id.* at 155:19-157:10.)

Ficker then moved toward the front yard, and then laterally back towards the sidewalk. (*Id.* at 163:17-18.) Craska again told Ficker that he was under arrest and he needed to get on the ground. (*Id.* at 163:19-20.) Ficker again refused and insisted that Craska fight. (*Id.* at 163:20.) Ficker and Craska met around the sidewalk and began wrestling and punching each other on the ground. (*Id.* at 163:20-164:11.) During the fighting, Craska went for his radio microphone to call for help. (*Id.* at 165:16-17.) Ficker grabbed the microphone from Craska and pulled it in an apparent attempt to rip the microphone off of Craska. (*Id.* at 165:17-20.) After that failed, Ficker began whipping Craska with the microphone. (*Id.* at 165:20-23.)

While wrestling on the ground, Ficker head-butted Craska multiple times, catching Craska above his eye. (*Id.* at 167:15-168:24.) Sometime during the struggle, Mindek came over to assist and was able to get a handcuff on one of Ficker's wrists. (*Id.* at 169:11-15.) According to Craska, Ficker twice attempted to choke him out with his legs—getting one leg over Craska's head and another leg underneath Craska's chin. (*Id.* at 171:15-124.) Mindek shouted to Craska that Ficker was reaching for his gun. (*Id.* at 173:16-17.) Craska felt the flap on his holster had been opened and both he and Mindek put their hands on top of Craska's weapon in order to prevent Ficker from gaining control of the gun. (*Id.* at 173:18-22, 174:23-175:19.) Finally, Craska drew his service weapon with his right hand and put it behind his back. (*Id.* at 179:7-8.) He continued to fight Ficker with his left hand until he was able to shove Ficker off. (*Id.* at 179:9-10.)

Ficker briefly backed away a short distance from Craska. (*Id.* at 179:10-11.) Craska claims that he was beginning to lose consciousness. (*Id.* at 179:12-13.) Craska says that he brought his weapon up and pointed it at Ficker, and warned Ficker to stop resisting, to stop going for his gun, that he was under arrest, and that if he did not stop he was going to die. (*Id.* at 179:13-18.) Craska claims that he could barely hold his arms up. (*Id.* at 179:21-23.) According to Craska, Ficker ignored his commands and got into a fighting stance. (*Id.* at 179:19-20.) Ficker then charged at Craska and Craska fired a single shot, killing Ficker. (*Id.* at 179:19-21.) Craska originally stated that Ficker was a few feet away when he shot him, but later admitted that such testimony was inconsistent with Ficker's autopsy, which proved that the muzzle of the gun was between six and nine inches away from Ficker when fired. (*Id.* at 199:1-8.)

## II. PLAINTIFF'S MOTION TO STRIKE

As a preliminary matter, Plaintiffs move this court to strike Defendants' Scene Re-creation DVD manually filed in support of Craska's Motion and Mindek's Motion (ECF No. 38) and attached to Craska's Motion as Exhibit I (ECF No. 39-9). Plaintiffs assert that the court should strike the DVD because Defendants' re-creation has not been authenticated as required by Federal Rule of Evidence 901 and is inconsistent with Defendants' accounts of the event and other evidence, rendering it more prejudicial and misleading than probative. Defendants never responded to Plaintiffs' Motion.

The court finds that it is unnecessary to strike the exhibit in the present situation. The court viewed the DVD in respect to addressing Plaintiff's Motion to Strike, but did not rely on it in making its decisions on Defendants' Motions for Summary Judgment. The re-creation appears to be an attempt to visually illustrate the testimony given by Defendants Craska and Mindek and pictures from the scene. Because the court has the depositions and other statements of Defendants, the court found the DVD to be neither probative nor prejudicial. Thus, the court denies Plaintiff's Motion to Strike as moot at this time.

## III. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and provides:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A party asserting there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including

> depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Though the Rule was amended in 2010, the summary judgment standards and burdens have not materially changed. See Fed. R. Civ. P. 56 advisory committee's notes (2010 Amendments) ("Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c)...."); *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 n. 4 (1st Cir. 2011). In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases, the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the

nonmoving party's claim"; or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.*

If the moving party meets its burden of production, then the non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Zinn v. United States*, 885 F.Supp.2d 866, 871 (N.D. Ohio 2012) (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id.* Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

## IV. SUMMARY JUDGMENT ANALYSIS

Defendants have each submitted their own Motions for Summary Judgment and base their Motions on several different arguments, some of which overlap and others that are unique to each specific Defendant. Both Defendants Craska and Mindek assert that they have qualified immunity as to all of Plaintiffs' 1983 claims. The court will address each argument in turn and combine Defendants' arguments to the extent that they overlap.

### A. Claims Against Craska and Mindek

#### 1. Federal 1983 Claim for Unlawful Search and Seizure

Under 42 U.S.C. § 1983, a citizen may bring a civil suit against a government official for deprivation of a constitutional right. To succeed in a § 1983 suit, a plaintiff must show that (1) a person acting under the color of state law (2) deprived the plaintiff of a Constitutional right. *Brown v. Lewis*, 2015 WL 794705, *5 (6th Cir. 2015). Plaintiffs assert that Defendants' use of excessive

force in detaining and subsequently attempting to arrest Ficker outside of Defendants' police jurisdiction was a violation of the Fourth and Fourteenth Amendments of the United States Constitution.

The Supreme Court has recognized two different types of seizure: (1) a short investigatory stop, also known as a "Terry" stop; or (2) an arrest. *Brown*, 2015 WL 794705 at *6. Each type of seizure has its own level of scrutiny. A court will find an investigatory stop to be reasonable if the totality of circumstances showed that the officers had a reasonable suspicion, meaning "a particularized and objective basis for suspecting the particular person . . . of criminal activity based on specific and articulable facts." *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012). Additionally, "the degree of intrusion into the suspect's personal security [must be] reasonably related in scope to the situation." *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006).

An investigatory stop will become an arrest "[i]f the length and manner of the stop, including any force used, are not reasonably related to the basis for the initial intrusion." *Brown*, 2015 WL 794705 at *6 (internal quotation marks omitted). An arrest requires a showing of probable cause by the officer. Probable cause requires a reasonable belief that the suspect has committed or is in the process of committing a crime.

a. Defendant Officer Craska

Plaintiffs assert that Craska committed two distinct unlawful seizures: (1) the initial detainment to pat-down Ficker and secure him in the squad car prior to arrest; (2) the attempt to arrest Ficker. Craska asserts that no reasonable jury could find in favor of Plaintiffs because: (1) "Craska was justified in his initial investigatory detention of Ficker"; and (2) "Craska was justified

13

in his attempt to arrest Ficker."(Craska's Motion at 12-14.) Plaintiffs assert that there remains genuine disputes of fact as to both of these arguments. The court will address each seizure in turn.

i. Initial Investigatory Detention of Ficker

The court finds Craska's argument that he was justified in his initial investigatory detention of Fisker not to be well-taken. There is a genuine dispute of fact as to whether Craska was acting reasonably within his authority in attempting to detain Ficker outside of Craska's jurisdiction. According to Urbach's version of events, both Urbach and Ficker declined to let Defendants search Urbach's car when Defendants requested to do so, and attempted to go into their home. According to Urbach, it was while walking into the house that Ficker was pulled away by Craska. (Urbach Dep. at 69:9-12.) According to Urbach, she had not yet given permission for Defendants to search her car and Ficker was being patted down and screaming for help. According to Urbach, it was only in an attempt to get the Defendants to stop harassing Ficker that she agreed to let them search her car.

Craska acknowledges that Ficker did not willingly go with Craska to the car for a pat-down. Craska also admitted in his deposition, that he did not believe that he had a reasonable basis to detain Mindek when he arrived at the house. Craska asserts that his decision to take Ficker to the squad car against Ficker's will was justified and lawful because it was to protect the Officers' safety during the consensual search in light of Ficker's criminal past and apparent intoxication. However, given the fact that Craska forcibly grabbed Ficker and pulled him to the squad car *before* Urbach gave consent to search her vehicle, there is a genuine issue of fact regarding whether Officers had a reasonable basis to conduct an investigatory stop, and whether the level of force used in effectuating that stop crossed the threshold into a forcible detainment or arrest.

Further, because Defendants Craska and Mindek were outside of their jurisdiction when they attempted to conduct the investigatory stop of Ficker, they did not have legal authority to do so absent Urbach or Ficker's consent. While Ohio law allows for an officer to continue to pursue a suspect outside of that officer's jurisdiction when the officer is in hot pursuit originating within that officer's jurisdiction, R.C. § 2935(D)(1)-(3), or arrest a suspect outside of the officer's jurisdiction with a warrant, R.C. § 2935.02, neither was the case here. Further, neither Craska nor Mindek had personally witnessed Ficker commit a crime up to that point, which is necessary to effectuate a citizen's arrest. *See* R.C. 2935.04 ("When a felony has been committed, or there is reasonable ground to believe that a felony has been committed, any person without a warrant may arrest another whom he has reasonable cause to believe is guilty of the offense, and detain him until a warrant can be obtained"). Thus, a reasonable jury could find that Defendants Craska and Mindek's attempt to pat down Ficker against his will was a violation of Ficker's Fourth Amendment rights.

For these reasons, the court finds that Craska has failed to meet his burden on this argument.

### ii. Attempt to Arrest Ficker

The court also finds there is a genuine issue of material fact as to whether Craska was justified in his attempt to arrest Ficker. Craska argues that his arrest was reasonable as a lawful arrest of Ficker who had committed a crime in Craska's presence by elbowing him, an officer, in the chest. Craska claims that it was only after this elbow by Ficker that he had probable cause to arrest Ficker. Mindek corroborates Craska's claim that Ficker elbowed Craska in the chest. Craska also argues that even if the initial arrest was unlawful, Ficker's elbowing incident would be criminal because a private citizen is not allowed to use physical force against a police officer to resist an

15

unlawful arrest. Under the circumstances, the court does not find Craska's argument to be well-taken.

Craska admitted in his deposition that he did not believe that he had enough information to detain Mindek when he arrived at Urbach's house. (Craska Dep. at 101:20-102:19.) Yet, he still tried to temporarily detain Ficker in the back of his squad car while he searched Urbach's vehicle. If Ficker did attempt to resist being unlawfully detained by elbowing Craska in the chest, such action would not necessarily be illegal as a matter of law. It is true that "in the absence of excessive or unnecessary force by an arresting officer, a private citizen may not use force to resist arrest by one he knows, or has good reason to believe, is an *authorized* police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances." *City of Columbus v. Fraley*, 324 N.E.2d 735, 740 (Ohio 1975) (emphasis added). Here, however, there is a genuine issue of fact as to whether Craska was using unnecessary or excessive force in effectuating an unlawful arrest.

Urbach's testimony indicates that she realized that Craska had grabbed Ficker as they were walking to the house, and she looked back and saw Ficker being pulled to the police car. According to Urbach, she asked Mindek to tell Craska to stop. Urbach also stated that Ficker was yelling to the neighbors for help. Considering Craska has conceded that he knew he did not have the authority to detain Ficker at that time, it would be reasonable for a jury to conclude that Craska had already used unnecessary or excessive force before Ficker allegedly elbowed Craska in the chest. Further, when construed in the light most favorable to the nonmoving parties, the facts indicate that Urbach and Ficker knew or had reason to believe that Craska and Mindek were *not authorized* police officers engaged in the performance of their duties because they were obviously outside of their statutory

jurisdiction of Cleveland. This is supported by the undisputed facts showing that Urbach made several calls to the Parma Police Department seeking help.

Given these facts, the court finds that Craska has failed to satisfy his burden to succeed on summary judgment regarding Plaintiffs' claim that Defendants violated Ficker's Fourth Amendment right to be free from unlawful arrest.

### 2. Federal 1983 Claim for Excessive Force

#### a. Officer Craska

The court finds that Craska has failed to meet his burden of showing that no jury could reasonably find his use of force to be excessive. In an excessive force claim, the court reviews the officer's actions to determine whether they were " 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [the suspect] [was] actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Here, the evidence all supports the assertion that Ficker and Craska were having a physical altercation leading up to the fatal shooting. The evidence also shows that both Defendants knew that Ficker was unarmed at the time of the shooting. The Officers had already patted Ficker down and taken away his small pocket knife, and both Defendants were still in possession of their guns. According to Craska, he shot Ficker because he felt himself slipping out of consciousness and feared death or serious bodily harm. However, according to eyewitness testimony, Mindek, whom Craska asserts he took for backup, was still there with his stun gun and was watching the fight without engaging. (Trial Tr. of Patrick Elhert at 44:6-9, 51:15-23, Pls.' Opp. To Craska's Mot. Summ. J. Ex.

E, ECF No. 46-5.)   Interpreting these facts in the light most favorable to the nonmoving party, this could indicate that Mindek did not view the situation as one that had reached a level of severity where Craska's life was in danger.  Further, in this circumstance, Craska could have told Mindek to stun Ficker or tackle him instead of deciding to use deadly force.

Additionally, the report and deposition of expert witness Melvin Tucker support the conclusion that Craska's use of deadly force, given the circumstances, was unreasonable.  (Expert Report of Melvin Tucker at 9, ECF No. 41-11.)  According to Tucker, Craska's use of deadly force was based on hypothetical actions that Ficker *could* take, not what was actually occurring.  (*Id.*) Tucker also pointed to the fact that Craska knew Ficker was unarmed.  (*Id.*)

Since the court must construe the facts in the light most favorable to the nonmoving parties, the court finds that Craska has failed show that his use of deadly force was objectively reasonable as a matter of law.

### b. Officer Mindek

Mindek argues that no reasonable jury could find in favor of Plaintiffs because his limited use of force was objectively reasonable.  The court finds Mindek's argument not to be well-taken.

Mindek's argument rests on the assertion that he is only liable for his express physical actions, specifically, "nothing more than joint and limb manipulations intended to assist Craska in stopping Ficker's aggression."  (Mindek's Mot. Summ. J. at 10.)  However, this is contrary to Sixth Circuit law.  In the Sixth Circuit, "a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).  Construing the

evidence in the light most favorable to Plaintiffs, the court finds that a reasonable jury could find that Mindek both observed or had reason to know that excessive force would be or was being used, and had both the opportunity and means to prevent such harm.

As detailed above, a reasonable jury could find that Craska's use of deadly force was excessive. According to the testimony of Urbach's neighbor, Patrick Ehlert, Mindek was on the side watching as the physical confrontation between Mindek and Ficker continued to escalate. (Elhert Trial Tr. at 44:6-9, 51:15-23.) According to Craska, immediately prior to his use of deadly force, Craska shoved Ficker back and told him: "If you don't quit going for my gun, that's it. You're gonna die." (Craska Dep. at 179:15-17.) Construing this in the light most favorable to Plaintiffs, at that moment, Mindek had reason to know that Craska's use of excessive deadly force was likely to occur. Mindek still had an operational stun gun and knew that Ficker was unarmed, but instead of intervening to diffuse the situation and avoid Craska's use of deadly force, Mindek decided not to.

The Cleveland Police Department's Internal Affairs Unit also concluded that Mindek "failed to adequately assist [Craska] with the physical confrontation[,] . . . failed to utilize his city issued taser or use a level of force necessary to attempt to control Ficker" and that Mindek's "action, or inaction, may have had a profound effect in the fatal outcome." (Cleveland Division of Police Internal Affairs Unit Administrative Review at 3, Pls.' Opp. to Craska's Mot. Summ. J. Ex. A, ECF No. 46-1.) Further, Mindek admitted that his decision not to intervene was "because he feared future gatherings with his wife's family would be uncomfortable." (*Id.*)

Construing such evidence in the light most favorable to Plaintiffs, the court finds that a reasonable jury could find Mindek liable for his failure to prevent excessive force. Thus, the court finds summary judgment inappropriate on this claim.

### 3. State Law Claim for Intentional Infliction of Emotional Distress

To succeed in a claim for intentional infliction of emotional distress, Urbach must show: "(1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." *Phung v. Waste Mgt., Inc.*, 644 N.E.2d 286, 289 (Ohio 1994). Mindek asserts that he is entitled to summary judgment on Urbach's claim of intentional emotional distress because Urbach "cannot meet any of the elements necessary to support" such a claim. (Mindek's Mot. Summ. J. at 14.) Specifically, Mindek maintains that "there is no evidence that Mindek engaged in conduct that was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency," and argues that his "limited use of force against Ficker involved limb and joint manipulations intended to stop Ficker's assault." (*Id.*) The court does not find Mindek's argument to be well-taken.

Taking the facts in this case as a whole, and construing them in the light most favorable to Plaintiffs, a reasonable jury could find that Mindek's conduct was extreme and outrageous and intended to create emotional distress. The facts show that Mindek left his shift at work early to investigate his wife's claim that Ficker had stolen her property. The facts also show that Mindek decided to forego the traditional procedures of calling the police and instead called Craska, an officer he knew personally, on Craska's personal cell phone. As determined by the Cleveland Police Department's Internal Investigations Unit, "Mindek used his position as a Police Officer for improper gain and influence." (Cleveland Police Dep't Internal Affairs Administrative Review at 3.) This is further supported by the fact that neither Mindek nor Craska ever informed the Parma

Police Department that they were conducting an investigation in their jurisdiction, as is ordinary custom. (Expert Report of Melvin Tucker at 7.)

Defendants arrived to Urbach's house knowing that they were outside of their jurisdiction and aware that they had no authority to detain Ficker without his consent. Yet, construing the facts in favor of Plaintiffs, Defendants still attempted to pat-down and detain Ficker after he had already declined to speak to them, which Ficker had the right to do. According to Urbach, she asked Mindek to tell Craska to stop and leave Ficker alone. It was only in an attempt to diffuse the confrontation that Urbach eventually consented to let Defendants conduct a search of her car. Further, a reasonable jury could conclude that after intentionally creating a confrontational situation with Ficker, Mindek failed to intervene in the situation and allowed it to escalate to the point of Craska using deadly force against Ficker. Taking all of these facts in the light most favorable to Plaintiffs, a reasonable jury could find Mindek liable for intentional infliction of emotional distress.

Thus, the court denies Mindek's Motion for Summary Judgment on the state law claim for intentional infliction of emotional distress.

#### 4. State Law Claim for Willful, Wanton, and Reckless Conduct

Plaintiffs' state law claim for willful, wanton, and reckless conduct asserts that Defendants Craska and Mindek "failed to exercise due care and acted in a willful, wanton, and reckless manner while engaged in police functions and activities which culminated in the death of Daniel Ficker." (Compl. at ¶ 42.) Mindek asserts that the court should grant summary judgment in his favor because his manipulation of Ficker's hands and legs was just reasonable assistance of Craska in "prevent[ing] Ficker from gaining control of Craska's gun." The court finds Mindek's argument inadequate to warrant summary judgment in his favor.

Under Ohio law, the terms "willful," "wanton," and "reckless" are three distinct terms with different meanings. *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012). Willful conduct is defined as "an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Id.* Wanton conduct is defined as "failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* Reckless conduct is defined as "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.*

Mindek's argument that his physical assistance to Craska was not willful, wanton, or reckless, addresses merely one of several actions that a reasonable jury could find as willful, wanton, or reckless. The evidence shows that Mindek purposefully called Craska on Craska's personal cell phone to seek his assistance in investigating the stolen property, instead of going through the proper channels. Mindek also failed to follow usual police protocol dictating that he and Craska notify the Parma Police Department that they were investigating a crime in their jurisdiction. After arriving to Urbach's house and beginning the investigation, Mindek failed to adequately prevent a volatile situation with Ficker from escalating, "[f]ailed to assist [Craska] to the extent necessary," and "[f]ailed to utilize available options in subduing [Ficker]." (Internal Affairs Investigation Report at 2.) A reasonable jury could also find that any one of those decisions could likely, possibly, obviously lead to such harms as unlawful detainments and excessive force.

Therefore, the court finds that a reasonable jury could find such conduct to be willful,

wanton, or reckless. Thus, the court denies Mindek's Motion for Summary Judgment on Plaintiffs' state law claim for willful, reckless, or wanton conduct.

### 5. State Law Claim for Assault and Battery

Mindek's only argument supporting his Motion for Summary Judgment as to Plaintiffs' state law claim for assault and battery is that his use of force was privileged as force "reasonably necessary . . . to preserve the peace and maintain order, or to overcome resistance to his authority." (Mindek's Mot. Summ. J. at 17.) Mindek argues that, as "an officer attempting to make a lawful arrest for a misdemeanor," he was "under no obligation to retreat or retire to avoid the necessity of using extreme measures to prevent receiving great bodily injury." (*Id.* (quoting 4. Am. Jur. 54, § 77).) The court does not find Mindek's argument to be well-taken.

As detailed above, there are two seizures at issue in this case, both of which, construing the facts in the light most favorable to Plaintiffs, a reasonable jury could find were unlawful. Not only did Mindek potentially assault Ficker by touching him while trying to arrest him, Mindek may also be held liable for using physical force to try to get Ficker into the squad car prior to Craska allegedly having probable cause to arrest him. Since the privilege that Mindek argues is applicable applies only in regard to force used in a *lawful* arrest, summary judgment on the issue is inappropriate because a reasonable jury could find that there was no lawful arrest.

Thus, the court denies summary judgment on Plaintiffs' state law assault and battery claim.

### 6. State Law Claim for False Arrest

Under Ohio law, a false arrest claim requires a showing that the defendant intentionally detained a person unlawfully. *Thacker v. City of Columbus*, 328 F.3d 244, 261 (6th Cir.2003). Further, "[m]alice, motive, or lack of probable cause are not elements," but a showing of probable

cause will defeat a false arrest claim. *Saucedo Carrillo v. United States*, 983 F. Supp. 2d 917, 922 (N.D. Ohio 2013) (citing *Thacker*, 328 F.3d at 261).

Mindek asserts that summary judgment should be granted in his favor in respect to Plaintiffs' state false arrest claim because Defendants had probable cause to arrest Ficker. The court does not find Mindek's argument to be well-taken. As detailed above, a reasonable jury could find that Defendants used unreasonable or excessive force against Ficker before he allegedly elbowed Craska in the chest. The alleged elbow by Ficker is Defendants' basis for their argument that they had probable cause when they first attempted to arrest Ficker. Further, a reasonable jury could find that Defendants' attempt to forcibly detain Ficker in the back of the squad car, prior to the elbow incident, exceeded the scope of an investigatory stop and was an unlawful detention or arrest. Given that Craska admitted to not having probable cause at that point, such unlawful detention would satisfy the elements of false arrest.

Thus, the court finds that summary judgment on Plaintiffs state law claim for false arrest inappropriate.

### 7. State Law Claims for Wrongful Death and Survivorship

Under Ohio law, "to prevail in a survival and wrongful death action, [a plaintiff] must show that [(1)] the defendant owed the decedent a duty, [(2)] that the defendant breached that duty, and [(3)] that the defendant's breach of duty proximately caused the decedent's injuries and death." *Garcia v. Puskas Family Flowers, Inc.*, 671 N.E.2d 607, 609 (Ohio Ct. App. 9th Dist. 1996) (citing *Feldman v. Howard*, 226 N.E.2d 564, 566-567 (Ohio 1967)). Mindek asserts that the court should grant summary judgment because, judging Mindek's use of force "objectively at the time that force was employed, . . . Mindek did not cause the death of [Ficker] and limited force Mindek used during

24

the encounter was justified." (Mindek's Mot. Summ. J. at 18.) The court does not find Mindek's argument to be well-taken.

As detailed above, construing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Mindek owed Ficker a duty to intervene and prevent Craska's unconstitutional use of deadly force and that Mindek violated that duty by failing to intervene. Therefore, a reasonable jury could find Mindek liable for wrongful death.

Thus, the court finds summary judgment inappropriate on Plaintiffs' state law claim for wrongful death.

<u>8. Federal Qualified Immunity</u>

Defendants Craska and Mindek assert that they are protected by qualified immunity against all of Plaintiffs' federal claims. Government officials who are performing a discretionary function are entitled to qualified immunity from suit as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 55U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). Defendants seeking qualified immunity bear the initial burden of establishing "that they were acting within the scope of their discretionary authority during the incident in question." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). The court finds that qualified immunity is inappropriate here.

First, there is a genuine issue of fact as to whether Defendants were acting within the scope of their discretionary authority. The evidence shows that Defendants knowingly left their statutory jurisdiction without following proper protocol to do so. Defendants did not call the Parma Police Department to inform them of their investigation in Parma jurisdiction, nor did they request a Parma

25

police officer with the proper authority to assist. When Craska did call Cleveland Police Department, he only received permission to go investigate, not to detain someone.

Although a police officer can continue hot pursuit of a suspect that originated within the officer's jurisdiction into another jurisdiction and conduct an arrest when the officer witnesses a crime taking place, construing the facts in the light most favorable to Plaintiffs, none of these circumstances were present when Defendants initially engaged and tried to detain Ficker. As mentioned earlier, Craska has admitted that he did not have cause to lawfully detain Ficker when he arrived at Urbach's house.

Second, a reasonable jury could find that Defendants violated clearly established statutory or constitutional rights of which a reasonable person would have known. As detailed above, a reasonable jury could find that Defendants committed the Fourth Amendment violations of unlawful search and seizure and excessive force. Under the circumstances, a reasonable jury could also find that Defendants' use of force in attempting to put Ficker in the squad car prior to having probable cause to arrest him was a violation which Defendants knew of, given that Mindek admitted that he knew that he did not have the authority to detain Ficker when they arrived and did not believe he had probable cause for arrest until after Ficker allegedly elbowed him.

Thus, the court finds that Defendants are not protected by qualified immunity.

### 9. State Law Immunity

Defendants Craska and Mindek argue that they are entitled to statutory immunity on all state law claims under R.C. § 2744.03(A)(6). Under § 2744.03(A)(6), an employee of a political subdivision is immune from civil liability unless one of the following exceptions applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

26

> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

Defendants argue that such immunity applies here because Defendants were acting under the color of law as Cleveland Police Officers and Plaintiffs cannot establish any of the exceptions to such immunity. The court finds Defendants' argument not to be well-taken. For the reasons detailed above, a reasonable jury could find that Defendants acted outside of their scope of employment and/or that Defendants' "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Thus, the court finds that Defendants are not covered by § 2744.03(A)(6) immunity in the current case.

## B. Governmental Liability Claim Against the City of Cleveland

In their Complaint, Plaintiffs assert that the City's failure to adequately train or control its officers on "governing jurisdictional authority, the application of probable cause to make arrests, and the use of deadly force . . . proximately caused the constitutional violations" alleged against Craska and Mindek. (Compl. at ¶ 40.) Municipalities may be held liable under 42 U.S.C. § 1983 for the unconstitutional violations of their employees where the municipality's "policy or custom" was the direct cause of the violation. *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978). However, where there is no underlying constitutional violation, a municipality cannot be held liable. *See Scott v. Clay County, Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) (citing *City of Los*

*Angeles v. Heller*, 475 U.S. 796, 799 (1986)) ("Nevertheless, our conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well.").

To prevail on a claim against a municipality under § 1983, a plaintiff must establish both: (1) the deprivation of a constitutional right; and (2) the city's responsibility for that violation. *See Howard v. City of Girard, Ohio*, 346 F. App'x 49, 51 (6th Cir. 2010) (citing *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). In general:

> there are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted). As detailed above, a plaintiff may show municipal liability under 42 U.S.C. § 1983 under a 'failure to train' theory. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1988). However, "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *Id.* (emphasis added). As the Sixth Circuit has stated, "the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.' " *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)).

The City asserts that it "is entitled to judgment as a matter of law on [P]laintiffs' [§] 1983 claim because [(1)] there was no violation of Daniel Ficker's constitutional rights, and [(2)] because the City does not have a custom, policy, or practice that violated Daniel Ficker's constitutional rights.

As detailed above, the court has found that, construing the facts in the light most favorable to the nonmoving party, a reasonable jury could find that Craska and Mindek violated Ficker's constitutional rights. Therefore, the court rejects the City's first argument without further explanation. For the following reasons, the court also finds the City's argument regarding Plaintiffs' failure to link the Officers' constitutional violations to the City's policies or customs not to be well-taken.

To show a municipality's deliberate indifference, it is "ordinarily necessary" for a plaintiff to show a "pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011) (internal quotation marks omitted). Such a showing demonstrates [p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees." *Id.* (internal quotation marks omitted). Absent such notice of continuously ineffective training, "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* However, "in a narrow range of circumstances," municipal liability may be triggered where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).

Plaintiffs have not provided any evidence showing a pattern of similar constitutional violations by other Cleveland police officers. Therefore, Plaintiffs can only avoid summary judgment on its governmental liability claim if, construing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that the violations at issue here were the highly predictable consequences of the City's failure to train. The court finds that construing the evidence in the light

most favorable to Plaintiffs, a reasonable jury could find that the constitutional violations of unlawful search and seizure in violation of the Fourth Amendment is a highly predictable consequence of the City's failure to adequately train its officers.

Plaintiffs most compelling evidence on this issue is the Expert Report and deposition of Expert Melvin Tucker. Most relevant here, Tucker concluded that:

> [Defendants] were not properly trained on the concept of reasonable suspicion and did not have the level of proof necessary to reasonably suspect that [Ficker] had comitted the crime of theft from [Mindek's] home. Lacking the level of proof necessary to establish reasonable suspicion, [Defendants] had no authority to (1) detain Ficker; (2) to conduct a pat-down (frisk) of Ficker; or (3) to arrest Ficker.

> * * * *

> The failure of the Cleveland Police Department to provide policy guidance to their officers on the limitation of their authority to take a law enforcement action outside the city limits of the City of Cleveland demonstrated a deliberate indifference to the safety of persons coming into contact with Cleveland Police Officers and was causally connected to the shooting death of [Ficker] by [Craska]."

(Expert Report of Melvin Tucker at 5-7.)

This conclusion is also supported by other evidence. While Craska does not explicitly state that he did not know the difference between his authority in Parma versus his authority in Cleveland, Craska's deposition testimony reveals that he evaluated the situation with Mindek and his constitutional authority to conduct a pat-down and temporarily detain Ficker as if his authority as a police officer was fully intact. For example, although Craska did not believe that he had enough information to detain Mindek—meaning probable cause—when he arrived at Urbach's house, he still believed that he had the authority, as a police officer, to forcibly escort Ficker to Craska's squad car for a pat-down, despite Ficker's clear objection. (Craska Dep. at 101:20-102:19.) Such a seizure is

unconstitutional and a highly-probable consequence of the City's failure to adequately train its officers on their lack of authority to conduct such detainments without probable cause when outside of their statutory jurisdiction.

Thus, construing the evidence in the light most favorable to the nonmoving party, the court finds that the City has failed to meet its burden and denies its Motion for Summary Judgment.

## V. CONCLUSION

For the foregoing reasons, the court hereby denies Defendant Craska's Motion for Summary Judgement (ECF No. 39), Defendant Mindek's Motion for Summary Judgment (ECF No. 40), and Defendant City of Cleveland's Motion for Summary Judgment (ECF No. 41). The court denies as moot Plaintiffs' Motion to Strike Defendant Craska's and Mindek's Exhibit I (ECF No. 44).

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
CHIEF JUDGE
UNITED STATES DISTRICT COURT


March 31, 2015